47 P.3d 348

**David Paul COON, Francis Ahloy Keala, Ronald Dale Libkuman, Constance Hee Lau, and Robert Kalani Uichi Kihune, in their capacities as Trustees of Kamehameha Schools Bishop Estate, Plaintiffs–Appellants/Cross–Appellees,**

v.

**CITY AND COUNTY OF HONOLULU, Defendant–Appellee/Cross–Appellant,**

and

**Does 1–10, Defendants.**

**No. 23246.**

Supreme Court of Hawai'i.

May 30, 2002.

---

Kelly G. LaPorte, Honolulu, on the briefs, (Gail M. Tamashiro, Honolulu, with her on the brief), of Cades Schutte Fleming & Wright, for plaintiffs-appellants/cross-appellees David Paul Coon, Francis Ahloy Keala, Ronald Dale Libkuman, Constance Hee Lau, and Robert Kalani Uichi Kihune, in their capacities as Trustees of Kamehameha Schools Bishop Estate.

Ann C. Teranishi, on the briefs, (Bert T. Kobayashi, and Lex R. Smith, Honolulu, with her on the brief), of Kobayashi Sugita & Goda, for defendant-appellee/cross-appellant City and County of Honolulu.

Martin Anderson, on the briefs, (Mark B. Desmarais and Lane C. Hornfeck, Honolulu, with him on the brief), of Goodsill Anderson Quinn & Stifel, for amicus curiae Association of Apartment Owners of The Kahala Beach.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by LEVINSON, J.

The present matter arises under Revised Ordinances of Honolulu (ROH) ch. 38 (1991).[1] The plaintiffs-appellants/cross-appellees David Paul Coon, Francis Ahloy Keala, Ronald Dale Libkuman, Constance Hee Lau, and Robert Kalani Uichi Kihune, in their capacities as Trustees of Kamehameha Schools Bishop Estate [hereinafter, "the Trustees"], appeal from the February 9, 2000 final judgment of the first circuit court, the Honorable Bode A. Uale presiding, entered in favor of the defendant-appellee/cross-appellant City and County of Honolulu [hereinafter, "the City"] and against the Trustees as to Counts I through V of the Trustees' complaint and in favor of the Trustees and against the City as to Counts VI through VIII. Specifically, the Trustees contest the circuit court's order, filed on October 20, 1998, denying their motions for partial summary judgment as to Counts I and II and its order, filed on January 5, 2000, granting the City's motion for summary judgment as to Counts I through V, upon which the circuit court's final judgment was partially based.

The City cross-appeals from the final judgment. Specifically, the City contests the circuit court's order, filed on February 10, 1999, granting the Trustees' motion for summary judgment as to Count VIII of the Trustees' complaint, upon which the circuit court's final judgment in favor of the Trustees and against the City as to Counts VI through VIII of the Trustees' complaint was based.

The Trustees advance four arguments on appeal as to why the circuit court erred in

---

1. As discussed more fully *infra,* ROH ch. 38 ("Residential Condominium, Cooperative Housing and Residential Planned Development Leasehold Conversions"), enacted by Ordinance 91–95 (1991), authorizes the City and County of Honolulu to acquire, either by voluntary purchase or through exercise of the power of eminent domain, the fee simple interest in land situated underneath condominium developments from the fee owners of the land in order to convey fee simple title to the owner-occupants of the condominium units, who, prior to the City's acquisition, leased the fee interests from the fee owners. As such, ROH ch. 38 provides a mechanism by which condominium owners may convert their leased fee interests into fee simple interests appurtenant to their condominium units. ROH ch. 38 authorizes the City's Department of Housing and Community Development to promulgate administrative rules in order to facilitate the lease-to-fee conversion process.

failing to grant them declaratory relief pursuant to Counts I and II of their complaint: (1) the circuit court erred in ruling that Rules for Residential Condominium, Cooperative and Planned Development Leasehold Conversion [hereinafter, "Rules"] § 2–3 (1993),[2] promulgated by the City's Department of Housing and Community Development [hereinafter, "the Department"], is valid and does not conflict with ROH § 38–2.2 (1991),[3] on the basis that Rules § 2–3 impermissibly lowers the minimum number of applicants required to trigger ROH ch. 38 proceedings pursuant to ROH § 38–2.2; (2) the circuit court erred in ruling that ROH ch. 38 is valid as applied to oceanfront property, because Hawai'i Revised Statutes (HRS) § 46–1.5(16) (Supp.2000)[4] prohibits the City from selling or otherwise disposing of oceanfront property; (3) the circuit court erred in ruling that the City may initiate eminent domain proceedings more than twelve months after having formally designated the property for lease-to-fee conversion pursuant to ROH ch. 38, because ROH § 38–5.2 (1991)[5] mandates that the City proceed with condemnation within twelve months of designation; and (4) the circuit court erred in ruling that the City did not violate Rules § 1–2 (1993)[6] and ROH ch. 38 by qualifying as applicants for lease-to-fee conversion cer-

2. Rules § 2–3 provides in relevant part:

> Not less than 25 condominium owners by number, or 50% of the condominium owners of a development, whichever shall be the lesser number, must apply as a condition precedent to the exercise of the power of eminent domain or the threat of eminent domain by the City.

The Department amended Rules § 2–3 on December 22, 2000 in respects not pertinent to the present matter.

3. ROH § 38–2.2 provides in relevant part:

(a) Subject to subsection (b) of this section, the [D]epartment may designate all or that portion of a development containing residential condominium land for acquisition, and facilitate the acquisition of the applicable leased fee interests in that land by the [C]ity through the exercise of the power of eminent domain or by purchase under threat of eminent domain, after:

(1) At least 25 of all the condominium owners within the development or at least owners of 50 percent of the condominium units, whichever number is less, apply to the [D]epartment to purchase the leased fee interest pursuant to Section 38–2.4, and file an application with the [D]epartment; and

(2) Due notice is given and a public hearing held [and] the [D]epartment finds that the acquisition of the leased fee interest in the development or a portion thereof, through exercise of the power of eminent domain or by purchase under threat of eminent domain and the disposition thereof as provided in this part, will effectuate the public purposes of this chapter. For purposes of this subsection, "condominium owners" means the owner-occupants of the condominium development.

(b) This land designated and acquired by the [C]ity may consist of a portion of or the entirety of the land area submitted to the declaration of condominium property.

4. HRS § 46–1.5(16) provides:

> Each county shall have the power to purchase and otherwise acquire, lease, and hold real and personal property within the defined boundaries of the county and to dispose of the real and personal property as the interests of the inhabitants of the county may require, except that: any property held for school purposes may not be disposed of without the consent of the superintendent of education; *no property bordering the ocean shall be sold or otherwise disposed of;* and all proceeds from the sale of park lands shall be expended only for the acquisition of property for park or recreational purposes.

(Emphasis added.)

5. ROH § 38–5.2 provides:

> Within 12 months after the designation of the development or portion thereof for acquisition, the [D]epartment *shall* facilitate the acquisition of the leased fee interest in the land beneath the development of the City and County of Honolulu through voluntary action of the parties, or the institution of eminent domain proceedings to acquire the leased fee interest or portion thereof so designated. If the leased fee interest is not acquired or eminent domain proceedings are not instituted within the 12 month period, the [C]ity *shall* reimburse the fee owner, the lessor, and the legal and equitable owners of land so designated for actual out-of-pocket expenses they incurred as appraisal, survey, and attorney fees as a result of the designation.

(Emphases added.)

6. Rules § 1–2 provides in relevant part:

> "Lessee" means a natural person to whom land is leased or subleased, including the person's heirs, successors, legal representatives and assigns, and who is also concurrently the owner-occupant of a residential condominium. . . .

The Department amended Rules § 1–2 on December 22, 2000 in respects not pertinent to the present matter.

tain trustees and trust beneficiaries, because, the Trustees claim, these applicants did not hold legal title to their condominium units while simultaneously residing therein, as required by ROH ch. 38.[7]

The City argues in its cross-appeal that the circuit court erred in awarding the Trustees out-of-pocket expenses pursuant to ROH § 38-5.2, *see supra* note 5, on the basis of the City's failure to proceed with condemnation of the Trustees' property within twelve months of designation for lease-to-fee conversion, because, *inter alia*, the Trustees encouraged the delay and thereby waived their right to recover these expenses.

For the reasons discussed *infra*, we hold: (1) that the circuit court misconstrued ROH § 38-2.2, *see supra* note 3, in determining the minimum number of applicants required to initiate the ROH ch. 38 lease-to-fee conversion process and that Rules § 2-3, *see supra* note 2, does violate ROH § 38-2.2 by impermissibly lowering the minimum number of applicants required to trigger ROH ch. 38 proceedings; (2) that the circuit court correctly concluded that HRS § 46-1.5(16), *see*

*supra* note 4, does not prohibit ROH ch. 38 lease-to-fee conversions of oceanfront property; (3) that the circuit court misconstrued ROH § 38-5.2, *see supra* note 5, as enunciating a directory rather than a mandatory time limitation and that the City may not initiate a condemnation action pursuant to ROH ch. 38 more than twelve months after the property has been designated for acquisition; (4) that the circuit court correctly ruled that condominium owners are not barred from purchasing their leased fee interests pursuant to ROH ch. 38 simply because the legal title to their condominium unit is held in trust; and (5) that the circuit court correctly awarded out-of-pocket expenses to the Trustees, pursuant to ROH § 38-5.2, *see supra* note 5, because the City failed to proceed with condemnation of the Trustees' property within the twelve months mandated by the ordinance. Accordingly, we partially affirm and partially vacate the circuit court's final judgment, entered on February 9, 2000, and remand the matter to the circuit court for further proceedings consistent with this opinion.

---

7. ROH § 38-1.2 (1991) provides in relevant part:

"Lessee" means any person to whom land is leased or subleased, including the person's heirs, successors, legal representatives, and assigns and who is the owner-occupant of the residential condominium unit . . . .

. . . .

The terms "lessors," "lessees," "fee owner," and "legal and equitable owners" mean and include individuals, both masculine and feminine, and the terms also mean and include corporations, firms, associations, trusts, estates, and the state and the City and County of Honolulu. When more than one person are the lessors, lessees, fee simple owners, or legal and equitable owners of a lot, the terms apply to each of them, jointly and severally.

ROH § 38-2.4 (1991) provides in relevant part:

(a) No sale of any condominium land within a development shall be made unless the lessees:

(1) Are at least 18 years of age and are owner-occupants of their condominium units;

(2) Are bona fide residents of the City and County of Honolulu;

(3) Have legal title to, or pursuant to an agreement of sale, have an equitable interest in a condominium situated on the leased property applied for . . . [; and]

(4) Do not own property in fee simple lands suitable for residential purposes within the City and County of Honolulu[.] . . . A person is deemed to own lands, for the purpose

of this paragraph, if the person, the person's spouse, or both the person and the person's spouse (unless separated and living apart under a decree of a court of competent jurisdiction) own lands, including any interest, in a land trust in the City and County of Honolulu . . . .

The requirements enumerated in Rules §§ 1–2 and 2–4 (1993) are virtually identical to those enumerated in the ordinance. Rules § 1–2 defines an "owner-occupant" in relevant part to mean "any individual in whose name . . . legal title is held in a residential condominium unit . . . which serves concurrently . . . as the individual's principal place of residence," and Rules § 2–4 sets forth the following eligibility criteria for applicants for lease-to-fee conversion:

To be eligible to purchase a leased fee interest, an applicant shall:

(a) Be a bona fide resident of the City and County of Honolulu;

(b) Be at least 18 years of age and the owner-occupant of the condominium described in the application. Ownership shall include either legal title or the equitable interest of a purchaser under an Agreement of Sale;

(c) Own no other property in fee simple suitable for residential purposes within the city, or have pending before the State Housing Finance and Development Corporation or the department, any unrefused application to lease or purchase residential real property for dwelling purposes.

## I. BACKGROUND

The Trustees own fee simple title to the land underlying two residential condominium developments known as The Kahala Beach and Kuapa Isle, which are located in the City and County of Honolulu. The land underlying The Kahala Beach borders the ocean, and the land underlying Kuapa Isle borders Kuapa Pond. The Kahala Beach comprises 196 residential condominium units, and Kuapa Isle comprises 234 residential condominium units. The owners of the condominium units, some of which are held in trust, lease fee interests in the land from the Trustees.

The present matter arises out of the City's attempt to condemn some of the Trustee's land underlying the aforementioned condominium developments pursuant to Ordinance 91 95 (1991), codified as ROH ch. 38 [hereinafter, variously, "ROH ch. 38" or "the ordinance"]. ROH ch. 38 authorizes the City, under certain circumstances, to acquire a landowner's interest in the land beneath condominium developments in order to convey fee simple title to the condominium unit owners who desire to own, rather than lease, the fee interest in the land (so-called, "lease-to-fee conversions").[8] *See* ROH ch. 38, arts. 1 & 2; *see generally Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 868 P.2d 1193, *reconsideration denied,* 76 Hawai'i 247, 871 P.2d 795 (1994). The Trustees and the City disagree over the interpretation and application of the ordinance.

### A. *Kuapa Isle Condominiums*

On July 13, 1995, the Department advised the Trustees that it had designated the land underlying the Kuapa Isle condominium development for acquisition, through the exercise of the power of eminent domain or by purchase under the threat of eminent domain, pursuant to ROH § 38-2.2, *see supra* note 3. The City informed the Trustees that

thirty-six owner-occupants of condominium units in the project, six of whom were denominated as "trustees," had applied for lease-to-fee conversions. The Department submitted a resolution authorizing condemnation proceedings in order to acquire the leased fee interests in the land underlying Kuapa Isle to the City Council in March 1996;[9] the City Council deferred action on the resolution at its March 19, 1996 Policy Committee meeting, at which the Trustees, as landowner, opposed the resolution. The City requested, however, that the Trustees waive any claim to out-of-pocket expenses that they might be entitled to recover pursuant to ROH § 38-5.2, *see supra* note 5, due to the City Council's deferral of the resolution. In a subsequent letter to the Trustees, the City reminded the Trustees that "these expenses would not be recoverable if the City were to institute the condemnation action prior to July 12, 1996"—*i.e.*, within twelve months of the City's designation of the leased fee interests for acquisition. An agreement was apparently reached, which the City described in a letter, dated July 11, 1996 and written by Jon Yoshimura, Chair of the City Council's Committee on Policy, acting on behalf of the City:

> After telephonic discussion with you and discussion between my committee staff and [the Trustees'] counsel, I am gratified that [the Trustees] would be willing to waive and release these claims on the condition that the City will not pass any resolution authorizing condemnation of any leased fee interest at Kuapa Isle until the claims for relief in *Richardson v. City and County of Honolulu,* 802 F.Supp. 326 (D.Haw.1992), appeal docketed, No. 94–16041, 94–16142, and 94–16143 (9th Cir.1994) and *Small Landowners v. City and County of Honolulu,* 832 F.Supp. 1404 (D.Haw.1993), appeal docketed, No. 94–16327 (9th Cir.1994)

8. The validity of ROH ch. 38 has been the subject of extensive litigation in both the state and federal courts, but has ultimately been upheld as a valid exercise of the City's power of eminent domain. *See Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 868 P.2d 1193 (1994), *reconsideration denied,* 76 Hawai'i 247, 871 P.2d 795 (1994); *Richardson v. City and County of Honolulu,* 124 F.3d 1150 (9th Cir.1997), *cert. denied,* 525 U.S. 871, 119 S.Ct. 168, 142 L.Ed.2d

137 (1998); *see also Small Landowners of Oahu v. City and County of Honolulu,* 832 F.Supp. 1404 (D.Haw.1993); *Richardson v. City and County of Honolulu,* 802 F.Supp. 326 (D.Haw. 1992).

9. This resolution apparently superseded a prior resolution submitted in January 1996.

[hereinafter, "the *Richardson* appeals"] have been dismissed by a final non-appealable and non-reviewable judicial determination either that Ordinance 91–95 is valid and constitutional under the federal and state constitutions or is invalid and unconstitutional under the federal and state constitutions, and all claims and motions therein and all appeals and writs therein or therefrom have been finally decided, resolved, and dismissed with respect to the facial constitutionality or validity of Ordinance 91–95.

I would appreciate your timely concurrence with the proposed waiver and release conditions set forth in the paragraph immediately above.

On September 8, 1997, the United States Court of Appeals for the Ninth Circuit entered a decision affirming the constitutionality of ROH ch. 38. *See Richardson v. City and County of Honolulu,* 124 F.3d 1150 (9th Cir.1997). On September 23, 1997, the Trustees petitioned for an *en banc* rehearing of the *Richardson* decision, which the Ninth Circuit denied on March 23, 1998. The Trustees subsequently petitioned the United States Supreme Court for a writ of certiorari, which was denied on October 5, 1998, *see City and County of Honolulu v. Small Landowners of Oahu,* 525 U.S. 871, 119 S.Ct. 168, 142 L.Ed.2d 137 (1998), thereby resolving the Trustees' constitutional challenges to Ordinance 91–95 in the *Richardson* appeals by way of a final, non-appealable, and non-reviewable judicial determination.

In the meantime, on October 15, 1997, almost a year before the United States Supreme Court denied the Trustees' petition in the *Richardson* appeals, the Department informed the Trustees that it was submitting a new resolution to the City Council to authorize condemnation of certain leased fee interests underlying Kuapa Isle. The Department included in its letter to the Trustees a copy of the resolution and a list of thirty-three condominium units that had applied for lease-to-fee conversions, twenty-four of which had been included in the Department's original designation of the property for lease-to-fee conversion in 1995. The City passed the resolution on March 11, 1998.

## B. *The Kahala Beach Condominiums*

On November 20, 1997, the Department informed the Trustees that it had received a sufficient number of applications from lessees of The Kahala Beach to commence ROH ch. 38 proceedings. The City subsequently provided the Trustees with an application log, dated December 5, 1997, listing applications for lease-to-fee conversion from twenty-three condominium owners, fourteen of whom were denominated as "trustees." On February 2, 1998, the Department formally designated "all or a portion" of the land under The Kahala Beach for acquisition pursuant to ROH ch. 38.

## C. *Procedural History*

On February 18, 1998, the Trustees filed their complaint in the present matter in the first circuit court, alleging that the foregoing proposed acquisitions were without statutory authority, inasmuch as the City: (1) did not institute eminent domain proceedings with respect to Kuapa Isle within twelve months after the designation of the project for condemnation, in violation of ROH § 38–5.2, *see supra* note 5; (2) qualified "trusts," "trustees," and "trust beneficiaries" as applicants for lease-to-fee conversion of their condominium units in Kuapa Isle and The Kahala Beach, in violation of ROH §§ 38–1.2 and 38–2.4 and Rules §§ 1–2 and 2–4, *see supra* notes 6 and 7; (3) accepted internally inconsistent and apparently erroneous affidavits in support of the lessees' applications; (4) proposed to sell or otherwise dispose of oceanfront property acquired through the condemnation process, in violation of HRS § 46–1.5(16), *see supra* note 4; (5) failed properly to address the Trustees' concerns regarding the proposed conversions; and (6) designated the projects for condemnation when the number of applicants for lease-to-fee conversion did not meet the minimum requirements set forth in ROH § 38–2.2, *see supra* note 3. In Count I of the complaint, the Trustees prayed for a judgment declaring that: (1) "[t]o the extent that any or all of the foregoing conduct and decisions [by the City] were engaged in pursuant to informal or unpublished or other agency rules," such rules

were illegal, invalid, and unenforceable pursuant to HRS § 91–7 (1993);[10] and (2) Rules § 2–3 conflicted with ROH § 38–2.2 and was therefore invalid, void, and unenforceable pursuant to HRS § 91–14 (1993).[11] In Count II, the Trustees prayed for a judgment declaring, pursuant to HRS ch. 632 (1993),[12] that the City's foregoing conduct violated HRS § 46–1.5(16), ROH ch. 38, and the Rules, and, consequently, that the City's designation of the Trustees' property and proposed conversion were illegal, invalid, and unenforceable. In Count III, the Trustees prayed for an injunction to enjoin the City from pursuing the proposed leasehold conversions. In Count IV, the Trustees prayed for a judgment declaring that the leasehold conversion proceedings initiated by the City deprived them of property without due process of law, in violation of article I, section 5 of the Hawai'i Constitution (1993).[13] In Count V, the Trustees prayed for a judgment declaring that the City's interpretation and application of ROH ch. 38 and the Rules violated their rights under the due process clause of the fourteenth amendment to the United States Constitution.[14] In Count VI, the Trustees prayed for an award of their out-of-pocket expenses (incurred as a result of the designation of Kuapa Isle for acquisition), interest, other damages, and attorneys' fees on the grounds that the City had breached an alleged contract with the Trustees,

> pursuant to which [the Trustees] agreed to forego [their] claim to the actual out-of-pocket expenses [pursuant to ROH § 38–5.2] . . ., and the City agreed that it would not pursue condemnation proceedings of any leased fee interest at Kuapa Isle until [the Trustees'] challenge to Ordinance 91–95 (codified as ROH ch. 38)[had] been finally resolved.

In Count VII, the Trustees prayed for an award of the foregoing expenses on the grounds of promissory estoppel, based on the City's promise to defer condemnation of Kuapa Isle. In Count VIII, the Trustees prayed for an award of the foregoing expenses pursuant to ROH § 38–5.2, *see supra* note 5, in

10. HRS § 91–7 provides in relevant part:

(a) Any interested person may obtain a judicial declaration as to the validity of an agency rule as provided in subsection (b) herein by bringing an action against the agency in the circuit court. . . . The action may be maintained whether or not petitioner has first requested the agency to pass upon the validity of the rule in question.

(b) The court shall declare the rule invalid if it finds that it violates constitutional or statutory provisions, or exceeds the statutory authority of the agency, or was adopted without compliance with statutory rulemaking procedures.

11. HRS § 91–14 provides in relevant part:

(a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter. . . .

12. HRS § 632–1 provides in relevant part:

In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for . . . . Controversies involving the interpretation of . . . municipal ordinances . . . may be so determined . . . .

Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding. . . .

13. Article I, section 5 of the Hawai'i Constitution provides in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law . . . ."

14. The fourteenth amendment to the United States Constitution provides in relevant part that "no State shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." The Trustees subsequently reserved the right to have their federal due process claim adjudicated on a complete record in federal court pursuant to 42 U.S.C. § 1983.

the event that their agreement with the City was adjudged to be invalid or unenforceable.

On March 11, 1998, the Trustees filed two motions for partial summary judgment with respect to Counts I and II of their complaint. The first motion sought a declaration that: (1) ROH ch. 38, insofar as it applied to oceanfront property, including The Kahala Beach, was invalid, because it violated HRS § 46–1.5(16); and (2) Rules § 2–3 was invalid because it conflicted with ROH § 38–2.2, inasmuch as it lowered the number of qualified applicants required to trigger ROH ch. 38 proceedings. The second motion, sought a declaration that: (1) the submission of a resolution for condemnation of Kuapa Isle more than twelve months after the designation of the property for acquisition violated ROH § 38–5.2; and (2) the qualification òf trustees and trust beneficiaries who did not both hold legal title to and occupy their condominium units violated ROH ch. 38. On September 17, 1998, the Trustees filed a motion for partial summary judgment with respect to Count VIII of their complaint, seeking out-of-pocket expenses pursuant to ROH § 38–5.2, on the grounds that the City had failed to acquire any leased fee interest in Kuapa Isle and had failed to institute eminent domain proceedings regarding such interests within twelve months of the Department's designation of the property for lease-to-fee conversion.

On October 30, 1998, the circuit court, the Honorable James R. Aiona, Jr., presiding, denied both of the Trustees' March 11, 1998 motions.[15] The circuit court explained its ruling as follows:

(1) [The Trustees are] seeking summary judgment on the basis that [HRS § ] 46–1.5(16) precludes [ROH ch.] 38 proceeding[s] because the development involved is located on oceanfront property.

[The Trustees'] position on this issue does not accurately reflect a complete and literal interpretation of both HRS chapter 46 and ROH chapter 38. Lease to fee conversion as drafted and defined in ROH

chapter 38 does not vest ownership of land with the City and County of Honolulu. Moreover, it is quite evident that in reviewing the restriction cited in HRS Section 46–1.5(16) with all other provisions within section 1.5 and [the] remainder of chapter 46 that the restriction cited was not intended for ROH chapter 38 proceedings.

(2) [The Trustees are] seeking partial summary judgment on the basis that the City has violated the 12 month limitation period stated within ROH Section 38–5.2.

The consequences for non compliance of this time period is clearly stated within ROH Section 38–5.2. The consequence sought by [the Trustees] is not a rational inference, in light of the nature of the enumerated consequences and fact that this consequence was not enumerated.

(3) [The Trustees are] seeking partial summary judgment on the basis that the City has qualified "trustees" and "trust beneficiaries" for ROH [ch.] 38 proceedings.

This court is not persuaded by [the Trustees'] arguments relating to this legal issue. The Court views [The Trustees'] interpretation as a strained interpretation of "trust laws," the definitions, and intent of ROH Chapter 38.

(4) [The Trustees are] seeking partial summary judgment on the basis that ROH Section 38–2.2 and [Rules] Section 2–3 are in conflict and as such the rule is invalid.

The core of [the Trustees'] position lies with ROH Section 38–2.2's use of the word "owner" and Chapter 38's absence of a definition of that word. The Court finds [the Trustees'] position to be strained and contrary to the intent of ROH chapter 38.

On February 10, 1999, the circuit court, the Honorable Marie N. Milks presiding, granted the Trustees' September 17, 1998 motion with respect to Count VIII of their complaint, on the ground that the twelve-

---

**15.** The circuit court certified its October 30, 1998 disposition of the Trustees' motions for partial summary judgment as a final determination of the issues raised pursuant to Hawaiʻi Rules of Civil Procedure (HRCP) Rule 54(b). On September- ber 17, 1998, the Trustees filed a notice of appeal. On February 8, 1999, in No. 22079, this court dismissed the Trustees' appeal on the ground that the certification had been improvidently granted.

month period mandated by ROH § 38–5.2 had been exceeded and, therefore, the Trustees were entitled to their actual out-of-pocket expenses. The City had argued that the Trustees were not entitled to the award because there was no enforceable agreement to postpone proceeding with eminent domain and, in any event, the Trustees had encouraged the City to delay condemnation. But the circuit court reasoned that:

> If, as the City contends, there was no enforceable agreement between the City and [the Trustees] to waive and release [the Trustees'] claims for actual out-of-pocket expenses . . ., then the 12 month period mandated by ROH § 38–5.2 had been exceeded and [the Trustees] are therefore entitled to their actual out-of-pocket expenses allowed by ROH § 38–5.2.
>
> If there was an enforceable agreement as embodied in the letter dated July 11, 1996 from Mr. Jon Yoshimura, . . . then the Court finds that: (1) Mr. Yoshimura acted on behalf of the City; (2) the terms of the agreement are clear; and (3) the agreement was conditioned upon the City not moving at any time to pass any resolution until after a final non-appealable and non-reviewable judicial determination had been reached in *Richardson* . . . .
>
> Accordingly, the Court finds that under either scenario, the 12–month period had been exceeded and there was a conditional waiver in the agreement which could not be satisfied . . . .

The Trustees requested out-of-pocket expenses in the amount of $198,501.08, but the circuit court determined the amount owed by the City to be $54,416.36, plus interest at the rate of ten percent per annum from August 1, 1996 until the date of payment in full.

On September 10, 1999, the City filed a motion for summary judgment "on all remaining claims." On January 5, 2000, the circuit court, the Honorable Bode A. Uale presiding, granted the City's motion, reasoning as follows: (1) Counts III, IV, and V of the Trustees' complaint "were predicated entirely upon obtaining declaratory relief in [the Trustees'] favor on the first two counts"; (2) on October 20, 1998, the circuit court had denied the Trustees' motion for partial summary judgment with respect to their claims contained in Counts I and II;[16] and (3) the February 10, 1999 and July 16, 2000 orders regarding the Trustees' entitlement to out-of-pocket expenses resolved Counts VI, VII, and VIII of their complaint.

On February 9, 2000, the circuit court, the Honorable Bode A. Uale again presiding, entered a final judgment in favor of the City and against the Trustees with respect to Counts I through V and in favor of the Trustees and against the City with respect to Counts VI through VIII and ordered the City to pay the Trustees $54,416.36, plus interest. On March 9, 2000, the Trustees filed a timely notice of appeal. On March 23, 2000, the City filed a timely notice of cross-appeal.

## II. STANDARD OF REVIEW

### A. Motion For Summary Judgment

 We review the circuit court's grant or denial of summary judgment *de novo. Hawaii Community Federal Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence

---

**16.** The circuit court essentially treated its October 20, 1998 order denying the Trustees' motion for summary judgment as an order granting summary judgment in favor of the City. Although the October 20, 1998 order did not expressly do so, it effectively did, because there were no genu-

ine issues of material fact in dispute and the circuit court ruled that the Trustees' claims failed as a matter of law. Thus, there were no genuine issues of material fact for the fact-finder to consider.

and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* (citations and internal quotation marks omitted).

### B. *Statutory Interpretation*

We review the circuit court's interpretation of a statute *de novo.* *State v. Pacheco,* 96 Hawai'i 83, 94, 26 P.3d 572, 583 (2001). Our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .
>
> In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.
>
> . . . This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993).

*Id.* at 94–95, 26 P.3d at 583–84 (some citations and internal quotation marks added and some in original) (brackets in original). Moreover,

> [w]hen interpreting a municipal ordinance, we apply the same rules of construction that we apply to statutes. The interpretation of a statute is a question of law reviewable *de novo.* The purpose of the ordinance may be obtained primarily from the language of the ordinance itself; however, in order to construe the ordinance in a manner consistent with its purpose, the

language must be read in the context of the entire ordinance.

*Weinberg v. City and County of Honolulu,* 82 Hawai'i 317, 322, 922 P.2d 371, 377 (1996) (citations and internal quotation marks omitted).

### C. *Deference To The Decisions Of Administrative Agencies*

"Ordinarily, deference will be given to decisions of administrative agencies acting within the realm of their expertise[.]" *Mahauͤlepu v. Land Use Comm'n,* 71 Haw. 332, 335, 790 P.2d 906, 908 (1990) (citation omitted). "The rule of judicial deference, however, does not apply when the agency's reading of the statute contravenes the legislature's manifest purpose." *In re Water Use Permit Applications,* 94 Hawai'i 97, 145, 9 P.3d 409, 457 (2000) (citing *Camara v. Agsalud,* 67 Haw. 212, 216, 685 P.2d 794, 797 (1984), and *State v. Dillingham Corp.,* 60 Haw. 393, 409, 591 P.2d 1049, 1059 (1979)). "Consequently, we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation." *Id.; see also Government Employees Ins. Co. v. Dang,* 89 Hawai'i 8, 15, 967 P.2d 1066, 1073 (1998); *In re Maldonado,* 67 Haw. 347, 351, 687 P.2d 1, 4 (1984).

## III. *DISCUSSION*

### A. *The Circuit Court Partially Erred In Entering Final Judgment In Favor Of The City And Against The Trustees With Respect To Counts I And II Of The Trustees' Complaint.*

The Trustees advance four points of error regarding the circuit court's order denying their motion for partial summary judgment as to Counts I and II of their complaint and the resulting final judgment: (1) the circuit court erred in ruling that Rules § 2–3 does not conflict with ROH § 38–2.2, because Rules § 2–3 impermissibly lowers the minimum number of applications required by ROH § 38–2.2 as a precondition of the Department's designating property for lease-to-fee conversion; (2) the circuit court erred in ruling that HRS § 46–1.5(16) does not prohibit the lease-to-fee conversion of oceanfront

property, because (a) HRS § 46–1.5(16) prohibits the City from selling or otherwise disposing of oceanfront property and (b) the City acquires and sells or otherwise disposes of property pursuant to its role as facilitator of ROH ch. 38 conversions; (3) the circuit court erred in ruling that the City could proceed with condemnation of property pursuant to ROH ch. 38 more than twelve months after the Department had designated it for lease-to-fee conversion, the same being prohibited by ROH § 38–5.2; and (4) the circuit court erred in ruling that owners whose condominiums were held in trust were eligible to participate in lease-to-fee conversion, ROH ch. 38 requiring that condominium owners possess legal title to units that simultaneously serve as their principal places of residence. We address each of the Trustees' points of error in turn.

1. *Rules § 2–3 conflicts with the express requirements of ROH § 38–2.2 regarding the minimum number of applications required as a precondition of the Department's designating a condominium for lease-to-fee conversion.*

█ The Trustees assert that the Department's Rules § 2–3 is invalid, void, and unenforceable, because, in some cases, it authorizes the Department to designate property for lease-to-fee conversion without the minimum number of applicants required by ROH ch. 38. The Trustees note that Rules § 2–3 authorizes the Department to designate leased fee interests for condemnation when it receives applications from "25 condominium owners by number, or 50% of the *condominium owners* of a development,

whichever shall be the lesser number," *see supra* note 2, while ROH § 38–2.2(a)(1) requires applications from "[a]t least 25 of all the condominium owners within the development or at least owners of 50 percent of the *condominium units,* whichever number is less," *see supra* note 3 (emphases added). Because Rules § 1–2 and ROH § 38–2.2(a)(2) both define "condominium owners" to mean "owner-occupants," and not all the condominium units in a given development are necessarily owner-occupied, the Trustees argue that, by authorizing designation for condemnation based on the applications of fifty percent of the owner-occupants rather than fifty percent of the owners of all the condominium units, Rules § 2–3 impermissibly lowers the minimum number of applicants required as a precondition to the Department's designation of property for lease-to-fee conversion.[17]

█ The City defends the Department's interpretation of "owners of 50% of the condominium units" to mean "50% of the condominium owners," as set forth in Rules § 2–3, by arguing that requiring applications from "50% of the condominium units" produces an absurd result, contrary to the City Council's intent, because "[e]very aspect of [ROH ch. 38] speaks in terms of owner-occupants," rather than "condominium units." Moreover, the City claims that the Trustees' interpretation ROH § 38–2.2(a) would raise the number of applications required to trigger the lease-to-fee conversion of many condominium developments and, thus, would "prohibit lease-to-fee conversion for an overwhelming number of condominium owner-occupants."[18] Finally, the City urges that

---

**17.** In the case of The Kahala Beach, for example, the Trustees note that, because only forty of the 196 units are purportedly owner-occupied, the Department's Rules § 2–3 would authorize designation based on only twenty qualified applications, while ROH § 38–2.2(a)(1) would require at least twenty-five qualified applications. Because the City received applications from twenty-three qualified applicants from The Kahala Beach, the correct interpretation makes all the difference in determining whether the condominium owners of The Kahala Beach are entitled to benefit from the lease-to-fee conversion process.

**18.** The City urges a "liberal construction" of the ordinance based on the fact that ROH ch. 38 is remedial. *See, e.g., Taylor v. Government Em-*

*ployees Ins. Co.,* 90 Hawai'i 302, 308, 978 P.2d 740, 746 (1999) (holding that a remedial statute should be construed liberally in order to accomplish the purpose for which it was enacted). The Trustees, on the other hand, urge a "strict construction" of the ordinance based on the fact that ROH ch. 38 authorizes the City's exercise of the power of eminent domain. *See, e.g., Marks v. Ackerman,* 39 Haw. 53, 58–59 (1951) (holding that provision of eminent domain statute should be strictly construed against the condemnor); *In re Widening of Fort Street,* 6 Haw. 638, 646–47 (1887) ("when a statute confers upon the Government or other parties the right to take another's property for public purposes, every form and particular required by such statute must be complied with"). *See also Housing Fin. & Dev. Corp.*

we defer to the Department's interpretation of the ordinance, because the Department is the regulatory authority charged with the ordinance's administration.

We agree with the Trustees that Rules § 2–3 conflicts with the plain language of ROH § 38–2.2(a)(1), insofar as it impermissibly reduces the number of applicants required to trigger ROH ch. 38 proceedings below that prescribed by ROH § 38–2.2(a)(1). Moreover, we are not persuaded by the City's argument that the plain language of ROH § 38–2.2(a)(1) produces an absurd result that is contrary to the City Council's intent or in dissonance with the rest of the ordinance, notwithstanding the Department's interpretation of ROH § 38–2.2(a)(1), as reflected in Rules § 2–3.

At the outset, we note that the phrases "owners of 50 percent of the condominium *units*" (emphasis added), as employed in ROH § 38–2.2(a)(1), and "50 percent of the condominium *owners*" (emphasis added), as employed in Rules § 2–3, differ fundamentally, inasmuch as the former bases the requisite calculation on the total number of condominium units in the development, while the latter bases the requisite calculation on the total number of condominium owners, which can be substantially less than the number of condominium units. Because ROH § 38–2.2(a)(s) and Rules § 1–2 both define "condominium owners" to mean "owner-occupants," the minimum number of applicants required to trigger ROH ch. 38 proceedings can vary considerably depending on which criterion controls. For example, if a condominium development includes only two owner-occupants, an application by one would be sufficient to designate the property for lease-to-fee conversion under Rules § 2–3, regardless of the number of units in the condominium development. Pursuant to the plain language of ROH § 38–2.2(a)(1), however, at least twenty-five owner-occupants would always be required to authorize designation of condominium developments comprising fifty or more units, while the owners of at least fifty percent of the units would be required if the development comprised less than fifty units.[19]

None of the provisions of ROH ch. 38 is inconsistent with the plain language of ROH § 38–2.2(a)(1). The City urges this court to consider the ordinance's focus on "owner-occupants," including the definition of the term "condominium owners" to mean "owner-occupants," and argues that the word "owners," as employed in ROH § 38–2.2(a)(1), should be similarly construed.[20] To

*v. Takabuki*, 82 Hawai'i 172, 178, 921 P.2d 92, 98 (1996) ("strict adherence to the express purposes of the [Hawai'i Land Reform Act] is foundational to the constitutionality of the Act"). We do not, however, deem these two principles of statutory construction to be in necessary conflict.

> The power of eminent domain must be conferred by the legislature, either expressly or by necessary implication, and will not be construed from doubtful inferences.
>
> . . . .
>
> Strict construction is not, however, the exact converse of liberal construction, for it does not require that the words of a statute be given the narrowest meaning of which they are susceptible. The language used by the legislature may be accorded a full meaning that will carry out its manifest purpose and intention in enacting the statute, but the operation of the law will then be confined to cases which plainly fall within its terms as well as its spirit and purpose. [*Coastal States Gas Producing Co. v. J.E.*] *Pate*, 158 Tex. 171, 309 S.W.2d [828,] 831 [(Tex.1958)].

*Mercier v. MidTexas Pipeline Co.*, 28 S.W.3d 712, 717 (Tex.App.2000) (some internal citations omitted). Thus, in the present matter, strict construction merely precludes "doubtful inferences"

and mandates that the grant of the power of eminent domain be found in the ordinance, "either expressly or by necessary implication." The express purpose of the ordinance promulgated by the City Council must, in turn, be effected to the fullest extent possible through interpretation of its language and the resolution of ambiguities in accordance with the "liberal construction" rule. As discussed *infra*, we discern no ambiguity in the phrase "condominium units."

**19.** A condominium development must have at least ten units, however, to qualify under either scenario, *see infra* note 24.

**20.** In addition, the City notes that the ordinance's provision for the conversion of the leased fee interests in "planned developments," *see* ROH § 38–1.2; *Richardson*, 76 Hawai'i at 52 & n. 5, 868 P.2d at 1199 & n. 5, authorizes designation after:

> At least 25 of all the *owners* within the development or at least *owners* of 50 percent of the residential units, whichever number is less, *of all the owners* within the planned development apply to the department to purchase the leased fee interest pursuant to Section 38–4.4, . . . and

the extent that the City argues, and the circuit court concluded, that the term "owners" as employed in ROH § 38–2.2(a)(1) should be understood to mean "condominium owners," *i.e.*, "owner-occupants," we agree. Indeed, HRS § 38–2.2(a)(1) expressly provides that the relevant applicants are those who "apply to purchase the leased fee interest pursuant to [ROH § ] 38–2.4," which restricts eligibility to "owner-occupants." [21] Accordingly, the applicants to whom ROH § 38–2.2(a)(1) refers, and who may be considered in determining whether sufficient lessees have applied for lease-to-fee conversions in order to trigger ROH ch. 38 proceedings, are owner-occupants of the relevant condominium units. *Cf. Housing Fin. and Dev. Corp. v. Castle*, 79 Hawai'i 64, 88, 898 P.2d 576, 599 (1995) (holding that the "twenty-five or more lessees or the lessees of more than fifty per cent of the residential lease lots within the development tract, whichever number is the lesser," required as a precondition to the acquisition of leased fee interests underlying residential development tracts pursuant to HRS § 516–22 (1993), must be qualified to purchase the leased fee interests under HRS § 516–33 (1993), which sets forth the eligibility criteria). By its plain language, however, ROH § 38–2.2(a)(1) nowhere states that "50 percent of the condominium units" means "50 percent of the condominium owners" or "50 percent of the

. . . .

For purposes of this subsection, *"owners,"* as used *[supra,]* means *the owner-occupants of the planned developments.*

ROH § 38–4.2(a) (emphases added). The City then argues that ROH § 38–2.2(a)(1), pertaining to "condominium development leaseholds," should be read to mean the same thing. In theory, however, the distinction between the two provisions could just as easily be read to reflect an intent on the City Council's part to differentiate between the two, especially when considered in light of the City Council's deliberate amendment of the provision for the designation of condominium developments, as discussed *infra.* Accordingly, we decline to address the City's argument in this appeal

21. ROH § 38–2.4 (1991) (entitled "Qualifications for purchase") provides in relevant part that "(a) [n]o sale of any condominium land within a development shall be made unless the lessees[ ](1) . . . are owner-occupants of their condominium units."

owner-occupied condominium units." [22] The language is clear and unambiguous. *See supra* note 3. We therefore hold that "50 percent of the condominium units," as employed in ROH § 38–2.2(a)(1), means just that—fifty percent of all the units in the condominium development.

Although we ground our holding in the ordinance's plain language, we nonetheless note that the ordinance's legislative history confirms our view. *Cf. Crichfield v. Grand Wailea Co.*, 93 Hawai'i 477, 488–89, 6 P.3d 349, 360–61 (2000) (reviewing legislative history to confirm court's holding based on statute's clear and unambiguous language); *State v. Ramela*, 77 Hawai'i 394, 396 n. 3, 885 P.2d 1135, 1137 n. 3 (1994) ("Although not necessary to our analysis, we note that the legislative history underlying [the statute] confirms the correctness of our analysis."). The City Council considered and expressly rejected the paradigm that the City urges. The initial committee draft of Bill 156, which, as amended, was eventually enacted as Ordinance 91–95, authorized the Department to designate a condominium development for condemnation after

[a]t least twenty-five (25) or at least fifty percent (50%), which ever number is less, of all the condominium owners [ (defined to mean owner-occupants) ] within the devel-

22. In this regard, it is worth noting that ROH § 38–1.2 (1991) defines "Condominium" simply to mean

a residential apartment, together with an appurtenant undivided interest in common elements, located on land subject to a declaration of condominium property regime as defined in HRS Chapter 514A, together with an appurtenant undivided interest in common elements, both used or occupied, or developed, devoted, intended, or permitted to be used or occupied as a principal place of residence for a single family.

The same section defines "owner-occupant" in relevant part to mean

any individual in whose name sole or joint legal title is held in a residential condominium unit, . . . which, simultaneous to the individual's ownership, serves as the individual's principal place of residence for a period of not less than one year immediately prior to application for conversion, as well as during the period pending legal proceedings to acquire the fee[.]

opment apply to the department to purchase [their] leased fee interest[.]

*See* Bill 156, CD–1 (1990). Had ROH ch. 38 been enacted as originally drafted, we would agree with the City that the terms of ROH § 38–2.2(a)(1) and Rules § 2–3 are in harmony with one another. The deliberate amendment of Bill 156, however, changing "fifty percent (50%) ... of all the condominium owners" to "owners of 50 percent of the condominium units," reflects that the City Council consciously rejected the approach that the City presently urges. *See Tangen v. State Ethics Comm'n,* 57 Haw. 87, 92–93, 550 P.2d 1275, 1279 (1976) (construing a "deliberate modification of the language" of a statute to evince a legislative intent to change the meaning of the statute); *In re Hawaiian Land Co.,* 53 Haw. 45, 60–61, 487 P.2d 1070, 1080 (1971) (rejecting interpretation embodied in a proposed, but ultimately rejected, amendment to a statute).

The City further argues, however, that the reason and spirit of ROH ch. 38 reveal that "it was clearly intended to allow owner-occupants to acquire fee simple title to the land beneath their residential condominium, cooperative, and planned development units." [23] We agree. But it is equally clear that ROH ch. 38 is drafted in such a way as to achieve its objective by means of condemnations in bulk, rather than on an *ad hoc* or unit-by-unit basis.

In enacting ROH ch. 38, the City Council determined that there was "a serious shortage of fee simple residential condominium land ... [and consequently] an artificial inflation in the value of such land in Oahu." *See* Ordinance 91–95 § 1. The City Council further found that,

[u]nder the burden of increased lease rents, many owner-occupants of residential condominium apartments ... have found, and will continue to find themselves unable to afford to continue living in their homes. If they are displaced from these homes,

these owner-occupant lessees could be displaced entirely from the ranks of homeowners because of Oahu's continuing housing crisis.

 . . . .

 ... It is therefore declared to be necessary and it is the purpose of this Ordinance to alleviate the conditions found in ... this Ordinance by providing for the right of any person who is a lessee or owner under a long-term lease of land upon which is situated ... residential condominium property regime projects ... to purchase at a fair and reasonable price a proportionate share of the fee simple title to such land.

*Id.*

 While the "purpose" section of the ordinance admittedly expresses the ambitious goal of providing "any person" with a share in fee simple land, such policy declarations are not substantive law that can expand the express terms of the operative provisions of the ordinance. *See Poe v. Hawaii Labor Relations Bd.,* 97 Hawai'i 528, 540, 40 P.3d 930, 942 (2002) ("The general rule of statutory construction is that policy declarations in statutes, while useful in gleaning the purpose of the statute, are not, of themselves, a substantive part of the law which can limit or expand upon the express terms of the operative statutory provisions.") (Citation omitted.); *see also Price Dev. Co. v. Orem City,* 995 P.2d 1237, 1246 (Utah 2000) (subscribing to proposition that policy sections or preambles to statutes "may be used to clarify ambiguities, but they do not create rights that are not found within the statute, nor do they limit those actually given by the legislation") (citations omitted). It is apparent that the City Council did not intend literally to confer an unqualified right upon "any person" to lease-to-fee condominium conversion because ROH ch. 38 expressly limits the grant of that right in numerous ways. For one, the City Council set the minimum size of an eligible

**23.** More specifically, the City argues that the City Council's intent was not to exclude owner-occupants who live in (1) projects with fifty or fewer units in which less than half the units are owned by owner-occupants and (2) projects containing more than fifty units in which there are less than twenty-five owner-occupants. The record is devoid, however, of any evidence regarding the number of condominium owners who would be precluded from acquiring their leased fee interests under either party's interpretation of the ordinance. Moreover, there is no evidence in the record that the City considered such numerical data in enacting Ordinance 91–95.

250

condominium development at ten units.[24] For another, at least in some instances, ROH § 38–2.2 incontrovertibly requires twenty-five owner-occupants to apply for conversion before the City can proceed with acquisitions. *See supra* note 3.[25] Were this not so, the "[a]t least 25 of all the condominium owners" language contained in ROH § 38–2.2(a)(1) would be superfluous. And "[o]ur rules of statutory construction requires us to reject an interpretation of [a] statute [or an ordinance] that renders any part of the statutory language a nullity." *Potter v. Hawaiʻi Newspaper Agency*, 89 Hawaiʻi 411, 423–24, 974 P.2d 51, 63–64 (1999) (citations omitted); *see also Konno v. County of Hawaiʻi*, 85 Hawaiʻi 61, 71, 937 P.2d 397, 407 (1997). Finally, there are a host of specific qualifications that must be met by each owner-occupant and his or her spouse in order to be eligible for lease-to-fee conversions under ROH ch. 38, see *supra* note 7. Thus, ROH ch. 38 clearly evinces the City Council's intent to facilitate lease-to-fee conversion in bulk rather than on an *ad hoc* or unit-by-unit basis.

The City Council's condemnation-in-bulk approach is consistent with what is required of the Department under ROH ch. 38. Once the Department has determined that the requisite number of lessees has applied to purchase leased fee interests pursuant to ROH ch. 38, the Department must give "due notice" and conduct a public hearing, as a result of which the Department must find that the acquisition and disposition of the land "will effectuate the public purposes" of the ordinance. *See* ROH § 38–2.2(a)(2), *supra* note 3. Once this is accomplished, the Department "may designate all or a portion of a develop-

ment containing residential condominium land for acquisition[ ] and facilitate the acquisition of the applicable leased fee interests in that land by the [C]ity through the exercise of the power of eminent domain or by purchase under threat of eminent domain[.]" *See* ROH § 38–2.2(a), *supra* note 3. The Department must institute any eminent domain proceedings to acquire the leased fee interests within twelve months of designating the land for acquisition. *See* ROH § 38–5.2, discussed *infra* in section III.A.3. Then, the authorized condominium lessees must purchase the fee interest from the City within sixty days. *See* ROH § 38–2.3 (1991).[26] If the applicant willfully breaches his or her agreement to purchase the leased fee interest, the Department is entitled to pursue "any available remedy, including the sale of its interest in the condominium." *Id.* In sum, ROH ch. 38 requires a significant expenditure of time and money on the City's part. The Department would be hard pressed to meet its responsibilities under the ordinance if it were forced to pursue conversions on an *ad hoc*, unit-by-unit basis, rather than in bulk. Indeed, incremental benefit to the public of the expenditure of such public resources would be marginal. *Cf. Housing Fin. and Dev. Corp. v. Takabuki*, 82 Hawaiʻi 172, 178, 921 P.2d 92, 98 (1996) ("It is incomprehensible how the designation for acquisition of the leased fee interest in a single residential houselot could ever satisfy the express, lofty public purposes of the [Hawaiʻi Land Reform Act]."). For this reason, owner-occupants living in condominium developments comprised of less than ten units are

24. ROH § 38–1.2 (1991) provides in relevant part that, "[t]o qualify as a development, there shall be 10 or more residential condominium apartment units or residential planned development housing units on the land."

25. Even under the Department's Rules § 2–3, any condominium development comprised of more than fifty owner-occupied condominium units would require twenty-five owner-occupant applicants to trigger ROH ch. 38 proceedings.

26. ROH § 38.2–3 provides in relevant part:

The condominium lessees who have authorized approval and who have qualified for purchase of the leased fee interest, shall purchase

from the [C]ity within 60 days of acquisition of the interest of the [C]ity, the leased fee interest appertaining to their condominiums, together with an undivided leased fee interest equal to the percentage of common interest appurtenant to the [lessee's] condominium units, subject to the terms, covenants, and conditions of the contract executed with the [C]ity. If any lessee refuses to enter into such a contract, then in that event, such lessee shall pay to the [C]ity all costs incurred by the [C]ity in the acquisition of the appurtenant condominium leased fee interest within the development including but not limited to appraisal costs, costs of publication, and survey, and the department is authorized to take whatever action it deems necessary to collect the costs . . . .

not eligible for lease-to-fee conversions. *See* ROH § 38–1.2, *supra* note 24. And, while developments involving twenty-five owner-occupants are always eligible, developments involving less than twenty-five owner-occupants are eligible only if owner-occupants are in possession of at least fifty percent of the condominium units in the development.

Finally, condemnation in bulk is consistent with the history of land reform in Hawai'i and HRS ch. 516 (1993 & Supp.2001), the Hawai'i Land Reform Act (HLRA), upon which ROH ch. 38 is modeled. As we observed in *Takabuki*, 82 Hawai'i at 178, 921 P.2d at 98, when the state legislature began to address the shortage of fee simple land in the O'ahu real estate market in 1967, it "specifically rejected portions of the proposed legislation that would have permitted condemnation of individual houselots." Instead, the legislature chose to promote "condemnation-in-bulk" to further its public purposes. *Id.* at 179, 921 P.2d at 99. Indeed, the legislature originally required the Hawai'i Housing Authority, as a feature of the lease-to-fee conversion process, to designate and acquire the leased fee interests in entire development tracts. *Id.* While this approach ultimately proved unworkable, and the minimum number of houselots required for conversion was reduced, "the legislature remained committed to the idea that the HLRA would 'provid[e] for the *simultaneous conversion of sizable numbers of leasehold lots* to individual fee simple ownership.'" *Id.* (quoting the Sen Stand. Comm. Rep. No. 630, in 1975 Senate Journal, at 1071) (brackets and emphasis in the quotation).[27]

■ In sum, and to recapitulate, we hold that Rules § 2–3 conflicts with ROH § 38–2.2, the ordinance that it seeks to implement. While an administrative agency's interpretation of the ordinance that it is responsible for implementing is normally accorded great weight, no deference is required when the agency's interpretation conflicts with or contradicts the manifest purpose of the ordinance it seeks to implement. *In re Water Use Permit Applications*, 94 Hawai'i at 145, 9 P.3d at 457 ("we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation"); *Camara v. Agsalud*, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984) (commenting that, in order for an agency's decision to be granted deference, it must be consistent with the legislative purpose). Consequently, because, "[i]n a declaratory judgment action challenging the validity of administrative rules, '[t]he court shall declare the rule invalid if it finds that it violates ... statutory provisions, or exceeds the statutory authority of the agency,'" we further hold that Rules § 2–3 is invalid and exceeds the authority afforded the Department under ROH ch. 38. *Foytik v. Chandler*, 88 Hawai'i 307, 315, 966 P.2d 619, 627 (1998) (quoting HRS § 91 7); *see also Agsalud v. Blalack*, 67 Haw. 588, 591, 699 P.2d 17, 19 (1985) ("it is axiomatic that an administrative rule cannot contradict or conflict with the statute it attempts to implement"); *Jacober v. Sunn*, 6 Haw.App. 160, 167, 715 P.2d 813, 819 (1986) (holding that an administrative agency "may not enact rules and regulations which enlarge, alter, or restrict the provisions of the act being administered").

Accordingly, the circuit court erred in concluding that Rules § 2–3 constitutes a valid exercise of the Department's authority pursuant to ROH § 38–2.2 and the Trustees were entitled to a declaratory judgment that Rules § 2–3 is invalid insofar as it impermissibly lowers the number of applicants required to trigger lease-to-fee conversion. In the present matter, however, the invalidity of Rules § 2–3 only invalidates the Department's designation of The Kahala Beach condominiums, because the Department received

---

27. The City Council modeled the threshold requirements for conversion in ROH ch. 38 after those promulgated in the HLRA. *See* Report of the City Council Committee on Housing, Committee Report No. 545 (1991) ("The purpose of this measure is to provide to the leasehold owners of condominium properties the same right to purchase the land under their homes as is currently provided the owners of single family dwellings .... The provisions are generally patterned after Chapter 516, Hawai'i Revised Statutes, known as the Land Reform Act."); *see also Richardson v. City and County of Honolulu*, 802 F.Supp. 326, 340 (D.Haw.1992) (noting that Ordinance 91–95 is modeled after the HLRA and many of its procedural aspects are similar, if not identical).

more than twenty-five qualified applications from Kuapa Isle condominium owners and, therefore, did not exceed its authority pursuant to ROH § 38–2.2 by designating the Kuapa Isle condominiums for lease-to-fee conversion.

### 2. *HRS § 46–1.5(16) does not prohibit lease-to-fee conversion of oceanfront property.*

■ As we indicated *supra* in note 4, HRS § 46–1.5(16) provides in relevant part that the counties' general power to acquire and dispose of real and personal property in the public interest is qualified by the imperative that "no property bordering the ocean shall be sold or otherwise disposed of[.]" The Trustees argue that the circuit court erred in concluding that ROH ch. 38 is valid as applied to oceanfront property, because HRS § 46–1.5(16) specifically prohibits the City from selling or otherwise disposing of oceanfront property and, in the Trustees' view, ROH ch. 38 requires the City to acquire and sell property in order to effectuate lease-to-fee conversions.[28] The Trustees further argue that HRS § 46–1.5(16) does not make an exception for "conduit" sales of oceanfront property or distinguish among

oceanfront properties as a function of the means by which the City acquired or the duration of its holding them.

The City maintains that it does not actually sell any property pursuant to ROH ch. 38 because it does not obtain clear title to any land that it acquires in furtherance of the ordinance and, even if it did, that adherence to the plain language of HRS § 46–1.5(16) would produce an absurd result, unintended by the legislature, because the statute was simply meant to preserve public parks and beaches. We agree with the City's contention that HRS § 46–1.5(16) does not apply to the City's role in facilitating ROH ch. 38 lease-to-fee conversions.

■ The prohibition against the sale of oceanfront property, presently contained in HRS § 46–1.5(16), first appeared in the Revised Laws of the Territory of Hawai'i (RLH) in 1939 by way of Act 242,[29] long before the enactment of Ordinance 91–95, or, for that matter, any form of legislation relating to lease-to-fee conversion. Obviously, the 1939 territorial legislature could not have contemplated the City's future role in lease-to-fee condominium conversions when it enacted the statute.[30] Moreover, it is apparent

**28.** The Trustees urge us to focus on various provisions of the statute governing the mechanics of the City's role facilitating lease-to-fee conversions. For example, ROH § 38–1.8(f) (1991) directs the Department to "facilitate the acquisition of all necessary property interests by the [C]ity through eminent domain proceedings"; ROH § 38–1.9 (1991) instructs the City to "issue quitclaim deeds whenever it conveys, transfers, sells, or assigns any property . . . sponsored under this chapter"; ROH § 38–2.2(a) also directs the Department to "facilitate the acquisition of the applicable leased fee interests . . . by the [C]ity"; ROH § 38–2.3 provides that "condominium lessees who have authorized approval and who have qualified for purchase of the leased fee interest, shall purchase from the [C]ity within 60 days of acquisition of the interest of the [C]ity, the leased fee interest appertaining to their condominiums . . . . [I]n case of a wilful breach of the purchase agreement [with the lessee], the [C]ity shall be entitled to any available remedy, including the sale of its interest in the condominium"; and ROH § 38–2.4(b) provides that, "[i]n the event of a wilful breach of contract by the lessees, the [C]ity may sell or assign its interest" in the property.

**29.** 1939 Haw. Sess. L. Act 242, § 3021 at 139, empowered the City and County of Honolulu to:

sell at public auction . . . any real property acquired by the city and county whenever the board deems it advisable to abandon the use of such property for the purpose for which it was acquired; provided, however, that the proposed sale of any abandoned school site shall first be approved by the superintendent of public instruction, and that the proceeds from such sale shall be used only for acquiring land or for the erection of buildings for school purposes, and that the proposed sale of any park property or water works property subject to chapter 95 shall be subject to the provisions of section 3228 or 3267 as the case may be, and provided further that *no such real property bordering on the ocean shall be sold or otherwise disposed of.*
(Emphasis added.)

**30.** "The condominium, or horizontal property regime, [was] a . . . creature of statute" that was given its initial formal recognition in Hawai'i in 1961. *State Savings and Loan Ass'n v. Kauaian Dev. Corp.*, 50 Haw. 540, 541, 546, 445 P.2d 109, 112, 115 (1968) (citing 1961 Haw. Sess. L. Act 180, §§ 1 through 3 at 273–79 ("Horizontal Property Act")). The Hawai'i Land Reform Act (codified as HRS ch. 516 (1993 & Supp.2001)), which "allows eligible owners . . . of long-term

from the plain language of the statutory prohibition itself, as originally enacted and subsequently reenacted without substantive alterations, that it was intended to preserve *public* ownership of oceanfront property.[31] Act 242 authorized the City to sell any real property that it owned, so long as the City found it "advisable to abandon the use of such property for the purposes for which it was acquired," but set conditions on the City's ability to dispose of school property and public parks and prohibited the sale or disposal of oceanfront property. 1939 Haw. Sess. L. Act 242, § 3021 at 139. The statutory provision has not changed in any relevant respect in its application to the City since its original enactment, *see supra* note 4.

We believe that the prohibition against the sale or disposition of publicly owned oceanfront property contained in HRS § 46–1.5(16) does not preclude the City's facilitation of lease-to-fee conversion of oceanfront property because the City acquires legal title to the land it conveys, pursuant to ROH ch. 38, solely for the purpose of converting the condominium owner's property interest in the land from leasehold to fee simple.

lease interests in residential lots the opportunity to obtain fee simple title to the land," was originally enacted by the legislature in 1967. *Housing Fin. & Dev. Corp. v. Castle,* 79 Hawai'i 64, 73 & n. 1, 81, 898 P.2d 576, 585 & n. 1, 593 (1995) (citing 1967 Haw. Sess. L. Act 307, §§ 1 through 46 at 488–503). The Honolulu City Council enacted Ordinance 91–95 on December 4, 1991, effective December 18, 1991. *Richardson,* 76 Hawai'i at 51, 868 P.2d at 1198.

31. The legislature has never expressed its intent regarding the prohibition beyond the language of the statutory provision itself.

32. Rules § 2–10 requires, *inter alia,* all applicants to:
(b) Pay to the [D]epartment 50% of the allocated costs attributed to each applicant, after crediting the initial deposit paid as stated in § 2–3, above; and
(c) Re-affirm the contract to purchase the leased fee interest from the City.
....
Any applicant who fails or refuses to comply with the requirements of this section shall be disqualified from participating further, and shall be charged with a proportionate share of the allocated costs incurred by the [D]epartment and the [C]ity to the date of disqualification.

Before the City takes any steps to facilitate lease-to-fee conversion pursuant to ROH ch. 38, the condominium owner seeking to convert his or her leasehold must "[e]xecute a contract for the purchase of the leased fee interest from the City" and tender a $1,000.00 deposit to cover the costs incurred by the City in facilitating conversion. *See* Rules §§ 2–3 and 2–4; *see also* ROH § 38–2.4. In addition, the condominium owner-applicant must "[r]e-affirm the contract to purchase the leased fee interest from the City" and "[p]ay to the [D]epartment 50% of the allocated costs attributed to each applicant, after crediting the initial deposit[,]" prior to the City's acquisition of the property. *See* Rules § 2–10 (1993).[32] The City must then either "arrange for a simultaneous acquisition and transfer to each approved applicant" of the respective leased fee interest, *see* Rules § 2–17 (1993),[33] or sell the leased fee interest to the approved applicant within sixty days of the City's acquisition, *see* Rules § 2–18 (1993).[34] Any applicant who fails to purchase his or her leased fee interest from the City within sixty days is liable on his or her contract with the City for the full pur-

The Department amended Rules § 2–10 on December 22, 2000 in respects not pertinent to the present matter.

33. Rules § 2–17 provides:
The City may pay for all legal and equitable interests which the City acquires in the development·from any legally authorized funds, or the City may arrange for a simultaneous acquisition and transfer to each approved applicant. The Department renumbered Rules § 2–17 as § 2–18 on December 22, 2000.

34. Rules § 2–18 provides:
Within 60 days following acquisition, the City shall sell the leased fee together with all other legal and equitable interests appurtenant to each condominium to the respective applicants. The sale price to each applicant shall be the cost of the particular leased fee plus a proportionate share of the actual amounts paid by negotiation or condemnation for all other legal and equitable interests, together with the allocated costs. The unused balance of any deposit shall be applied to the sale price of each applicant's unit.
The Department renumbered Rules § 2–18 as § 2–19 on December 22, 2000.

chase price. *See* Rules § 2–20 (1993); [35] ROH § 38–2.3, *supra* note 28.

Throughout the lease-to-fee conversion process, it is the condominium owner, and not the City, who has physical possession of the property. The City obtains and retains legal title to the property briefly, if at all, for the sole purpose of converting the condominium owner's title to the property from a leasehold to a fee simple interest and, if the City does not simultaneously acquire and transfer title, in order to secure the condominium owner's full payment of the property's purchase price.

Indeed, during the brief period of time within which the City holds any given leased fee interest pursuant to its role as facilitator of lease-to-fee conversions, it possesses none of the traditional indicia of land ownership other than mere legal title. *See, e.g., In re Fasi,* 63 Haw. 624, 634 P.2d 98 (1981) (recognizing the right to enter, maintain, and make improvements to real property as indicia of ownership); *City of Franklin v. Crystal Ridge, Inc.,* 180 Wis.2d 561, 509 N.W.2d 730, 733 (1994) (noting that the traditional indicia of land ownership include the rights, responsibilities, and benefits associated with that ownership, such as making improvements to the property, enjoyment of its use and profits, maintenance of fire and liability insurance, responsibility for repairs and maintenance, and payment of licenses, fees, and taxes on the property). We can discern nothing in either the Rules or ROH ch. 38 that grants the City the right to enter, use,

or improve the land, the fee simple interest in which it transfers pursuant to the ordinance, or that imposes upon the City the responsibility for the land's repair and maintenance. Moreover, the City has no discretion either to refuse to sell the fee simple interest to a qualified applicant or to retain the land and dedicate it for public use.[36] *See* Rules §§ 2–17 and 2–18, *supra* notes 33 and 34. This is because, as noted *supra,* prior to the City's acquisition of any interest in real property pursuant to ROH ch. 38, it has already contracted to convey the interest to a qualified condominium owner.

Consequently, because the City merely holds transitory title to the fee simple interest in real property pursuant to ROH ch. 38, solely for the purpose of effecting the conversion of the condominium owner's property interest in the land from leasehold to fee simple, to construe the City's transfer of that title to a qualified condominium owner as a "sale" or "disposition" of property, within the meaning of HRS § 46–1.5(16), would elevate form over substance, an approach we have repeatedly eschewed. *See, e.g., Dubin v. Wakuzawa,* 89 Hawai'i 188, 196, 970 P.2d 496, 504 (1999); *Konno,* 85 Hawai'i at 72, 937 P.2d at 408; *Sussel v. Civil Service Comm'n of City and County of Honolulu,* 74 Haw. 599, 615, 851 P.2d 311, 319 (1993).

Finally, and most importantly, prohibiting the lease-to-fee conversion of oceanfront property would fail utterly to advance the manifest purpose of HRS § 46–1.5(16). The real property at issue—the fee simple title to

**35.** Rules § 2–20 provides:
In the event the City has acquired the leased fee and all other legal and equitable interests appurtenant to a condominium and the applicant fails or refuses to pay the sale price as stated in § 2–18, above, the City shall have all the rights, remedies and recourse provided by law against the defaulting applicant, including civil actions and lawsuits. Upon the request of the fee owners, the director may negotiate terms, conditions and prices for a cancellation and rescission or a sale back to the fee owners. Notwithstanding such request, the director may at his discretion retain title in the City and sell the acquired interests to any other party by public auction or negotiated private sale. The defaulting applicant shall remain liable for the unpaid sale price stated in § 2–18, above, following any sale by the director.

The Department renumbered Rules § 2–20 as § 2–21 on December 22, 2000 and amended the section in respects not pertinent to the present matter.

**36.** Of course, if the condominium owner wilfully breaches his or her agreement to purchase the leased fee interest from the City, the City is "entitled to any available remedy" under the ordinance. ROH § 38–2.3. We do not reach the question whether the City would then be entitled to sell the property if it bordered on the ocean, nor do we speculate regarding the nature of the property interest that the City would hold in such a case. These questions are not at issue in the present matter, inasmuch as there is no allegation that any of the condominium owners have wilfully breached or intend wilfully to breach a purchase agreement with the City.

which is transferred by the City from one owner to another pursuant to ROH ch. 38—is privately owned and occupied both before and after the lease-to-fee conversion process, clearly not the publicly owned land that the legislature sought to preserve via HRS § 46–1.5(16).[37] Indeed, we can discern no purpose that HRS § 46–1.5(16)'s vitiation of ROH ch. 38 would achieve;[38] to the contrary, in our view, such a result would be senseless and absurd. *See* HRS § 1–15(3) (1993) ("Every construction which leads to an absurdity shall be rejected."); *Beneficial Hawaii, Inc. v. Kida,* 96 Hawai'i 289, 309, 30 P.3d 895, 914–15 (2001) ("[T]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality[.]" (citations and internal quotation marks omitted)); *Richardson,* 76 Hawai'i at 60, 868 P.2d at 1207 (recognizing that a departure from the plain language of a statute is justified where a literal construction of a statute produces an absurd result, clearly inconsistent with the purposes and policies of the statute).

Accordingly, we hold that the circuit court correctly ruled that HRS § 46–1.5(16) does not prohibit the condominium lease-to-fee conversion mechanism prescribed by ROH ch. 38 with respect to oceanfront property.

3. *ROH § 38–5.2 mandates that the City initiate eminent domain proceedings within twelve months of designating property for lease-to-fee conversion.*

██ The Trustees contend that the circuit court erred in ruling that the City could proceed with eminent domain proceedings more than twelve months after designating the Kuapa Isle property for acquisition pursuant to ROH ch. 38. They claim that the Department has adopted a *de facto* rule, allowing for the untimely institution of emi-nent domain proceedings, that conflicts with the clear mandate of ROH § 38–5.2, *see supra* note 5, which provides in relevant part that, "[w]ithin 12 months after the designation of the development or portion thereof for acquisition, the department *shall* facilitate the acquisition of the leased fee interest in the land ... or the institution of eminent domain proceedings." (Emphasis added.) The City counters that the use of the word "shall" does not necessarily mean that the provision is mandatory and that the ordinance should be read as directory, evincing a preference rather than a mandate, because the only consequence of failing to institute eminent domain proceedings within the prescribed period, as set forth in ROH § 38–5.2, is that the City must reimburse the landowner for his or her out-of-pocket expenses. The City further argues that it should not be barred from proceeding in this case because the delay was "approved at the urging and with the consent of" the Trustees. Based on the ordinance's language and overall structure, as well as the consequences befalling the private parties and the public interest resulting from the City's failure to proceed with condemnation in a timely fashion, we hold that the time provision contained in ROH § 38–5.2 is mandatory rather than directory.

██ This court has held that "[w]here the language of a statute is plain and unambiguous that a specific time provision must be met, it is mandatory and not merely directory." *State v. Himuro,* 70 Haw. 103, 105, 761 P.2d 1148, 1149 (1988) (holding that the deadline for conducting a hearing prior to the revocation of an arrested person's driver's license was mandatory rather than directory); *see also Town v. Land Use Comm'n,* 55 Haw. 538, 543–45, 524 P.2d 84, 88–89 (1974) (holding that a statute requiring a decision

37. The Trustees argue that were we to hold that HRS § 46–1.5(16) does not apply to ROH ch. 38 conversions we would "completely eviscerate the restriction [on the sale of oceanfront property] and [create] the incongruous construction that it applies only to property that the counties acquire by means other than eminent domain." We disagree. As discussed *supra,* the statutory prohibition is inapposite to ROH ch. 38, not because the City has acquired property by way of the power of eminent domain per se, but because the City has obtained legal title to the property, which it has already contracted to convey to a qualified condominium owner, in order to convert the condominium owner's property interest from leasehold to fee simple.

38. It is noteworthy that the Trustees are themselves unable to articulate any purpose that would be achieved by the application of the prohibition.

on a petition to amend designation of property from "agricultural" to "rural" was mandatory rather than directory and that any action taken after the deadline was null and void). Accordingly, we have generally interpreted the word "shall," in the context of statutory time limits, as creating a mandatory—rather than merely a directory—provision. *See Himuro,* 70 Haw. at 105, 761 P.2d at 1149; *In re Fasi,* 63 Haw. 624, 626, 634 P.2d 98, 101 (1981) (stating that statutory deadlines for perfecting appeals are generally mandatory). "We have also recognized, however, that while the word 'shall' is generally regarded as mandatory, in certain situations it may be given a directory meaning." *Himuro,* 70 Haw. at 105, 761 P.2d at 1149 (citing *Jack Endo Elec., Inc. v. Lear Siegler, Inc.,* 59 Haw. 612, 616, 585 P.2d 1265, 1269 (1978)); *see also State v. Toyomura,* 80 Hawai'i 8, 20, 904 P.2d 893, 905 (1995). If the plain language of the statute is unclear, we must determine legislative intent by

> a consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way or the other. We are also mindful that our primary duty in interpreting statutes is to ascertain and give effect to the intention of the legislature which, in the absence of a clearly contrary expression[,] is conclusively obtained by the language of the statute itself.

*Himuro,* 70 Haw. at 105, 761 P.2d at 1149 (citations, quotation signals, and ellipsis points omitted); *see also In re Water Use Permit Applications,* 94 Hawai'i at 147 n. 49, 9 P.3d at 459 n. 49 (citation omitted). "In general, a statute is directory rather than mandatory if the provisions of the statute do not relate to the essence of the thing to be done or where no substantial rights depend on compliance with the particular provisions and no injury can result from ignoring them.' " *Toyomura,* 80 Hawai'i at 20, 904 P.2d at 904 (quoting *Jack Endo Elec., Inc.,* 59 Haw. at 616–17, 585 P.2d at 1269).

▮ Bearing the foregoing principles in mind, we note that the word "shall" is used twice in ROH § 38–5.2, *see supra* note 5. Thus, ROH § 38–5.2 provides in relevant part that,

> [i]f the leased fee interest is not acquired or eminent domain proceedings are not instituted within the 12 month period, the [C]ity *shall* reimburse the fee owner, the lessor, and the legal and equitable owners of the land so designated for actual out-of-pocket expenses they incurred as appraisal, survey, and attorney fees as a result of the designation.

(Emphasis added.) The use of the word "shall" in the context of the ordinance's award of "actual out-of-pocket expenses" is clearly mandatory.[39] *See Schefke v. Reliable Collection Agency, Ltd.,* 96 Hawai'i 408, 451–52, 32 P.3d 52, 95–96 (2001) (noting that "HRS §§ 388–11(c) and 378–5 . . . mandate an award of attorney's fees to the prevailing party by employing the word 'shall' "); *Kahuku Agr. Co. (Hawaii), Inc. v. P.R. Cassiday, Inc.,* 68 Haw. 625, 628, 725 P.2d 1186, 1188 (1986) (holding that a trial court had no discretion with respect to the award of attorney's fees to a prevailing party pursuant to the mandatory language of HRS § 607–17, now repealed, which provided that "certain stated rates for attorney's fees "*shall* prevail and *shall* be awarded to the successful party, whether plaintiff or defendant' " (emphases in original)); *see also Kaiama v. Aguilar,* 67 Haw. 549, 556, 696 P.2d 839, 843 (1985) (holding that trial court had no discretion whether to award statutory recovery prescribed by HRS § 521–63(c) to tenants who were locked out of their apartment without cause or court order). Consequently, because we do not believe that the City Council would employ the same word twice in consecutive sentences in a paragraph of an ordinance and intend that the word have two, mutually exclusive, meanings, *see State v. Merino,* 81 Hawai'i 198, 217, 915 P.2d 672, 691 (1996) (recognizing the " 'canon of construction denominated *noscitur a sociis* [, which] may be freely translated as "words of a feather flock together," that is, the meaning of a word is to be judged by the company it keeps' ") (quot-

---

**39.** Indeed, if the word "shall" were not mandatory in this context, the provision would be meaningless; the City would never reimburse "actual out-of-pocket expenses" unless it were compelled to do so.

ing *State v. Aluli,* 78 Hawai'i 317, 321, 893 P.2d 168, 172 (1995) (quoting *State v. Deleon,* 72 Haw. 241, 244, 813 P.2d 1382, 1384 (1991))), the mandatory usage of the word "shall" with respect to the award of out-of-pocket expenses suggests that the usage of the word "shall" in the immediately preceding sentence is, likewise, mandatory.

Furthermore, the ordinance's enumeration of penalties for failure to comply with the statutory time provision indicates a mandatory rather than directory use of the word "shall" in connection with the time provision.[40] *See St. Regis Mohawk Tribe, New York v. Brock,* 769 F.2d 37, 41 (2d Cir.1985) (noting that a statutory time provision is mandatory if "it both expressly requires an agency or public official to act within a particular time period and specifies a consequence for failure to comply with the provision" (citations and internal quotation marks omitted)); *State v. Kleypas,* 40 P.3d 139, 257 (Kan.2001) (declaring that factors indicating that a statutory time provision is mandatory include "a provision for a penalty or other consequence of noncompliance") (citations and internal quotation signals omitted). Thus, the specific instruction set forth in ROH § 38–5.2 that the City "shall" proceed with condemnation within twelve months, combined with the enumerated consequences of failure to do so, expresses a mandate rather than a preference.

Construing the word "shall" as mandatory in the present context is consistent with the "the entire act, its nature, its object, and the consequences that would result from construing it" otherwise. *Himuro,* 70 Haw. at 105,

761 P.2d at 1149. First, the Department's designation under ROH § 38–5.2 is predicated on the submission of the requisite number of applications prescribed by the ordinance as the threshold for triggering conversion proceedings. It is intuitively obvious that the designation's significance and reliability diminish with time; the applicants upon whom designation is based may move, decease, or otherwise become ineligible for lease-to-fee conversion pursuant to ROH ch. 38.[41] Second, interpreting the deadline as directory rather than mandatory could adversely affect the private parties involved. If the time provision were merely directory, the Department could designate a project for conversion and defer the institution of condemnation proceedings indefinitely.[42] The resulting delays would hold lessors hostage to the openended threat of condemnation and leave lessees seeking to acquire their leased fee interests in a state of limbo, not knowing whether to wait for the City to proceed or to look elsewhere.[43] The adverse impact upon the private parties to ROH ch. 38 proceedings weigh in favor of interpreting the word "shall," as set forth in the time provision of ROH § 38–5.2, as mandatory rather than directory. *See Town,* 55 Haw. at 544, 524 P.2d at 88 (deeming the uses of the word "shall" with respect to time deadlines contained in a land use commission statute and regulation as mandatory rather than directory because "[t]he interested party [to a proceeding for a change in boundary] should not be placed in a state of limbo at the discretion of the applicant or the appellee, and the time limitations ... [insure] the protection of both the applicant and the adjoining landowners");

**40.** The circuit court erroneously concluded that the enumeration of a penalty for the City's failure to proceed with condemnation within twelve months of designation was the only consequence of failing to proceed within twelve months. *See supra* section I.C.

**41.** Indeed, the Trustees have alleged that the number of qualified applicants for leased fee interests in Kuapa Isle has dropped below twenty-five since the City's designation of the condominium development.

**42.** It is worth noting in this regard that the record is devoid of any evidence that the City has yet proceeded with condemnation of the land underlying Kuapa Isle or The Kahala Beach.

**43.** The commentary to *Uniform Law Commissioners' Model Eminent Domain Code* § 403 (1986) is particularly apt in this regard:

A prolonged delay in the initiation of [condemnation], following the required preliminary steps, may create avoidable uncertainties and personal anxieties for a property owner, as well as cause a diminution in the profitability of his property. In addition, the passage of considerable time following the adoption by a condemnor of a formal condemnation authorization ... could cloud the reliability of its determinations expressed therein.

*See also Kleypas,* 40 P.3d at 257 ("[I]t is a general rule that where strict compliance with the provision is essential to the preservation of the rights of parties affected and to the validity of the proceeding, the provision is mandatory[.]") (Citations and internal quotation signals omitted.).

 Moreover, construing the ordinance's time provision as mandatory does not unduly burden the Department or the City. We agree with the City that future condemnation is not barred after the twelve-month period has expired. Certainly, the City's ongoing power of eminent domain is not foreclosed simply because of the Department's failure to comply with ROH § 38–5.2. But it may not proceed with condemnation based on the authority it derives from a stale ROH ch. 38 designation. The Department must redesignate the property pursuant to ROH § 38–2.2.[44] *Cf. Takabuki,* 82 Hawai'i at 183, 921 P.2d at 103 (noting that "if, after a portion of a development tract has been designated pursuant to HRS § 516–22, the class of lessees whose houselots have been designated falls below the statutory minimum number of applicants for whatever reason, the [Housing Finance and Development Corporation] will be required to terminate the proceedings (and start again with a new designation only if enough qualified lessees can be found)"). This requirement is in keeping with the ordinance's commitment to condemnation in bulk, as discussed *supra* in section III.A.1.

Accordingly, we hold that the use of the word "shall" in ROH § 38–5.2 is mandatory and, consequently, that ROH ch. 38 does not authorize a condemnation action by the City more than twelve months after the Department's designation of the property for lease-to-fee conversion unless the Department redesignates the property pursuant to ROH § 38–2.2.[45]

4. *Condominium units held in trust are not excluded from participating in lease-to-fee conversions.*

 The Trustees' urge that the circuit court erred in ruling that the Department's designation of certain trustees and trust beneficiaries as qualified to purchase leased fee interests did not violate ROH ch. 38 and Rules § 1–2. They point out that the ordinance's plain language requires that qualified lessees own legal title to their condominium units, "which, simultaneous to the individual's ownership, serves as the individual's principal place of residence," and that neither the lessees nor their spouses own any other "property in fee simple lands suitable for residential purposes within the City and County of Honolulu." ROH §§ 38–1.2 and 38–2.4(a)(1), (3), and (4). In addition, they note that Rules § 1–2 defines a "lessee" to mean "a natural person." Thus, according to the Trustees,

where a condominium leasehold is held in trust, the *only* lessees qualified to purchase the fee interest pursuant to ROH ch. 38 are (i) trustees (because only trustees hold legal title to property), (ii) who are natural persons, (iii) who currently live and have continuously lived in the unit to which

---

44. In order to redesignate the property, the Department need not necessarily solicit or otherwise obtain new applications from owner-occupants seeking to purchase leased fee interests. Applications pursuant to ROH § 38–2.2 do not expire. The ordinance simply demands that the applications remain current—applicants remain qualified to purchase their leased fee interests "during the period pending legal proceedings to acquire the fee." ROH § 38–1.2. Thus, the Department must simply ascertain that the required number of qualified owner-occupants is still seeking to purchase leased fee interests and conduct a public hearing in order to determine that the acquisition of the leased fee interests continues to further the public purposes of the ordinance, pursuant to ROH § 38–2.2(a)(2).

45. Finally, we find no merit in the City's argument that it should not be precluded from proceeding with condemnation in this case because the Trustees encouraged the City's delay. First, the record is clear that the Trustees specifically urged the City to delay until the *Richardson* appeals were finally resolved, as discussed *infra* in section III.B., a request that the City failed to honor. Second, the owners of leased fee interests generally can be expected to urge the City not to proceed with condemnation. If such requests by landowners excused the City from proceeding with condemnation in a timely fashion, the mandatory time provision would fail to achieve one of its most important objectives—to protect the interests of applicants for lease-to-fee conversions, the ordinance's primary beneficiaries.

they hold legal title for a continuous period of not less than one year preceding their application of conversion, (iv) who own, and whose spouses own, no fee simple residential real property on Oahu, and (v) who otherwise meet the qualification requirements of ROH ch. 38.

(Emphasis in original.) The City argues that such a reading of ROH ch. 38 and the Rules produces an absurd and unnecessary result. The City points out (1) that the definition of "lessee," set forth in ROH § 38–1.2, includes "any person to whom land is leased or subleased, *including the person's* heirs, successors, *legal representative,* and assigns" (emphases added), (2) that a trustee is a "legal representative" of the trust's beneficiaries, and (3) that ROH § 38–1.2 further provides that "[t]he terms 'lessors,' *'lessees,'* 'fee owner,' and 'legal and equitable owners' mean and include individuals, corporations, firms, associations, *trusts,* estates and the state and City and County of Honolulu." [46] (Emphases added.) Therefore, the City argues, the City Council clearly intended that the benefits of ROH ch. 38 extend to owner-occupants who have elected to "structure the title to their assets in a trust." We agree with the City.

■■■ ROH ch. 38 is not free from ambiguity with respect to trusts. ROH § 38–1.2 defines "lessee" to include "any person to whom land is leased . . . and who is the owner-occupant of the residential condominium unit," defines "owner-occupant" as an "individual," and yet includes "trusts" and other legal entities—in addition to individuals—within its definitions of "lessees." Thus, ROH § 38–1.2 appears to be internally inconsistent insofar as it restricts the definition of a "lessee" to an "owner-occupant" who must be "an individual," while at the same time extending "lessee" status to trusts and other legal entities. Moreover, ROH § 38–2.4(a)(1) limits eligible lessees to those who "[a]re at least 18 years of age and are owner-occupants of their condominium units," requirements that only a natural person could meet. Nevertheless, the City Council's decision, re-

flected in ROH § 38–1.2, to define "lessees" to include "trusts" would be meaningless if "trusts" could never qualify to purchase the leased fee interests in condominiums to which they have title. "It is a cardinal rule of statutory construction that courts are bound, if rational ,and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *Franks v. City and County of Honolulu,* 74 Haw. 328, 339, 843 P.2d 668, 673 (1993) (quoting *State v. Wallace,* 71 Haw. 591, 594, 801 P.2d 27, 29 (1990) (quoting *Camara v. Agsalud,* 67 Haw. 212, 215–16, 685 P.2d 794, 797 (1984))); *see also Beneficial Hawaii, Inc.,* 96 Hawai'i at 309, 30 P.3d at 915; *State v. Young,* 93 Hawai'i 224, 236 n. 6, 999 P.2d 230, 243 n. 6 (2000); *In re John Doe, Born on November 23, 1978,* 90 Hawai'i 246, 250, 978 P.2d 684, 688 (1999). Thus, we must attempt to make sense of the City Council's inclusion of "trusts" within the definition of "lessees" and whether it evinces an intent to allow for the conversion of the leased fee interests of condominium units held in trust.

In enacting Ordinance No. 91–95, the City Council found that the division of land ownership on O'ahu—and specifically the phenomenon of condominium owners, among others, being required to lease the fee simple interest in the land underlying their condominium units—had contributed to the inflation of housing costs. Ordinance No. 91–95 § 1(a). To combat the rising cost of housing and to protect homeowners from losing their condominiums, the City Council sought to unify these property interests by creating a mechanism for the conversion of condominium owners' leased fee interests into fee simple interests appurtenant to their units. *Id.* ROH ch. 38's requirements that an applicant for lease-to-fee conversion, *inter alia,* hold legal title to his or her condominium unit, use the unit as his or her principal place of

---

**46.** Curiously, however, Rules § 1–2 does not parallel the ordinance's definition of the terms "lessor," "lessee," "fee owner" and "legal and equitable owner," but, rather, defines these terms to "include individuals, both male and female, and *except as to the term 'lessee',* corporations partnerships, associations, trusts, estates, the State of Hawai'i and the City and County of Honolulu." (Emphasis added.)

residence, and own no other property in fee simple within the City and County of Honolulu, obviously further the foregoing objectives. Correlatively, the ordinance excludes condominium owners who do not occupy their units or who occupy their unit but own other residential property in fee simple, because these owners are not among those most at risk of losing their homes.

Under Hawai'i law, a trustee holds legal title to property for the equitable benefit of the trust's beneficiaries, thereby dividing legal and equitable interest in the trust property. *See Welsh v. Campbell,* 41 Haw. 106, 107 (1955). But a trust is, nevertheless, a single bundle of interests, irrespective of its particular parts, for the benefit of the trust's beneficiaries. *See James v. Gerber Products Co.,* 483 F.2d 944, 949 (6th Cir.1973) ("Separating the legal and beneficial incidents of ownership in the property is a mere technical argument since there is only one interest at stake and that is the beneficiary's."). Thus, allowing the occupants of condominiums, who qualify to purchase their leased fee interests pursuant to ROH ch. 38 in all respects except that legal title to the condominium unit is technically held in trust for their benefit, to convert their leased fee interests in their condominium unit into fee simple interests furthers the ordinance's goal of protecting those condominium owners most at risk. Moreover, permitting such conversions gives greater effect to ROH ch. 38 in its entirety, consistent with the "cardinal rule of statutory construction" described above.

We agree with the Trustees, however, that where a condominium unit is held in trust, only the trustee of the property is eligible to purchase the fee interest on the trust's behalf. Because legal title to the trust property is vested in the trustee, *see Welsh,* 41 Haw. at 107, and because merger of legal title to the condominium and the fee simple interest in the land underlying it is the outcome that ROH ch. 38 is designed to bring about, it would be contrary to one of the manifest purposes of the ordinance to allow anyone other than the trustee to ac-

quire title to the condominium unit's leased fee interest.[47]

Accordingly, we hold that the benefits of ROH ch. 38 extend to owner-occupants of condominiums who have elected to structure the title to their assets in a trust, subject to the proviso that it is the trustee who is eligible to purchase the leased fee interest. Therefore, the circuit court correctly ruled that the City did not violate ROH ch. 38 by qualifying trustees of eligible trust beneficiaries to purchase the leased fee interests appurtenant to their condominium units.

### 5. *The bottom line.*

In sum, the circuit court erred, in part, in entering final judgment against the Trustees with respect to Counts I and II of their complaint. We hold: (1) that Rules § 2–3 violates ROH § 38–2.2 by impermissibly lowering the minimum number of applicants required to trigger ROH ch. 38 proceedings; (2) that HRS § 46–1.5(16) does not prohibit ROH ch. 38 lease-to-fee conversions of ocean-front property; (3) that ROH § 38–5.2 mandates that the City initiate a condemnation action against a property within twelve months of designating the property for acquisition; and (4) that condominium owner-occupants are not barred from purchasing their leased fee interests pursuant to ROH ch. 38 simply because legal title to their condominium units is held in trust for their benefit, so long as they otherwise qualify for lease-to-fee conversion.

### B. *The Circuit Court Correctly Awarded Out–of–Pocket Expenses To The Trustees Based On The City's Failure To Institute Eminent Domain Proceedings Within Twelve Months Of The Department's Designation Of The Property For Acquisition Pursuant To ROH Ch. 38.*

In its cross-appeal, the City argues that the circuit court erred in awarding out-of-pocket expenses to the Trustees pursuant to ROH § 38–5.2, based on the City's failure to initiate eminent domain proceedings within twelve months of designating Kuapa Isle for

---

**47.** Even the Trustees concede that a trustee who otherwise satisfies all the requirements of ROH ch. 38 and the Rules may apply for and purchase his or her leased fee interest.

condemnation, because the Trustees "consented to, and indeed requested, the delay of the City's condemnation proceeding." Indeed, the City goes so far as to claim that ROH § 38–5.2 does not allow for the compensation of a landowner "where the condemnation proceedings were delayed at the request of the landowner." (Emphases omitted.)

The Trustees maintain that any potential waiver of their right to out-of-pocket expenses under the ordinance was expressly conditioned by the City itself upon the City's refraining from passing

> any resolution authorizing condemnation of any leased fee interest at Kuapa Isle until the claims for relief in [the *Richardson* appeals] [were] dismissed by a final nonappealable and non-reviewable judicial determination ... and all claims and motions therein and all appeals and writs therein or therefrom [were] finally decided, resolved, and dismissed with respect to the facial constitutionality or validity of Ordinance 91–95.

In an attempt to circumvent its own acknowledgment of an expressly conditioned waiver, the City recharacterizes the Trustee's argument to be a complaint that the City acted too soon, rather than too late, because the City did not wait until the final resolution of the *Richardson* appeals before proceeding under ROH ch. 38. The City then argues that ROH § 38–5.2 does not allow for the compensation of a landowner under circumstances in which the City proceeds with condemnation prematurely, rather than belatedly, and, in any event, that the record contains no evidence that the Trustees "incurred any damage whatsoever as a result of the condemnation being filed seven months early." In fact, the City posits that it saved the Trustees money, insofar as they "would have

incurred even greater out-of-pocket expenses during this seven month period."

Notwithstanding the City's logic, the plain language of ROH § 38–5.2 is clear that if the City fails to proceed with acquisition of a property within twelve months of having designated it for lease-to-fee conversion, the City "shall reimburse the fee owner, the lessor, and the legal and equitable owners of land so designated" for certain specified out-of-pocket expenses. *See supra* note 5.[48] Thus, the only real question in dispute is whether the Trustees waived their right to compensation. The circuit court found that, viewing all the factual allegations in the light most favorable to the City, there was no waiver as a matter of law. We agree with the circuit court.

A waiver " 'may be expressed or implied[,]' and '[i]t may be established by express statement or agreement, or by acts and conduct from which an intention to waive may be reasonably inferred.' " *Wilart Associates. v. Kapiolani Plaza, Ltd.*, 7 Haw.App. 354, 359–60, 766 P.2d 1207, 1210–11 (1988) (citations omitted) (brackets in original).

> Generally, waiver is defined as an intentional relinquishment of a known right, a voluntary relinquishment of rights, and the relinquishment or refusal to use a right. *Association of Owners of Kukui Plaza v. Swinerton & Walberg Co.*, 68 Haw. 98, 108, 705 P.2d 28, 36 (1985). To constitute a waiver, there must have existed a right claimed to have been waived and the waiving party must have had knowledge, actual or constructive, of the existence of such a right at the time of the purported waiver. *Honolulu Fed. Sav. & Loan Ass'n v. Pao*, 4 Haw.App. 478, 484, 668 P.2d 50, 54 (1983).

*In re Estate of Searl*, 72 Haw. 222, 226–27, 811 P.2d 828, 831 (1991) (citations omitted). While the question whether a valid waiver

---

**48.** The City argues in its reply brief that the use of the word "shall" in ROH § 38–5.2 is directory, rather than mandatory, and that the provision was not intended

> for landowners like Bishop Estate to manipulate section 38–5.2 to obtain compensation for a delay that the landowner itself requested and consented to.... The purpose of ROH section 38–5.2 is apparent: to ensure that landowners

are compensated where the City abandons or otherwise is delinquent in carrying out the lease-to-fee conversion process.

The City cites no authority, however, in support of its interpretation of the City Council's intent, and we believe that the award of fees is clearly mandatory, rather than directory, given the City Council's use of the word "shall" rather than "may," as discussed *supra* in section III.A.3.

exists is generally a question of fact, "when the facts are undisputed it may become a question of law." *Hawaiian Homes Comm'n v. Bush*, 43 Haw. 281, 286 (1959) (citations omitted); *see also Stewart v. Spalding*, 23 Haw. 502, 517 (1916) ("The question of waiver is usually a mixed one of law and fact ..., but where the facts are undisputed and are susceptible of but one reasonable inference it becomes one of law for the court." (Citations omitted.)).

In the present matter, the parties do not dispute that the Trustees were aware of their rights under the ordinance and intended to waive them. Nor do they dispute that, in fact, the Trustees' waiver was "on condition" that the City stay authorization of condemnation of any leased fee interest in Kuapa Isle until the *Richardson* appeals were resolved by "a final non-appealable and non-reviewable judicial determination[,]" as acknowledged by the City in a letter written by Jon Yoshimura, Chair of the Committee on Policy of the City Council, dated July 11, 1996. The City does not dispute the letter, Yoshimura's authority, or the meaning that the Trustees ascribed to the letter. Moreover, the City does not deny that the City Council passed a resolution authorizing the condemnation of the Trustees' leased fee interests in Kuapa Isle on March 11, 1998, prior to the United States Supreme Court's denial of the Trustees' petition for a writ of certiorari—*i.e.*, prior to a final non-appealable and non-reviewable judicial determination in the *Richardson* appeals. The City's only argument is

that, as a governmental entity, the City could not contract away its sovereign authority to take property by eminent domain. But the City cannot have it both ways: either there was a conditional waiver, which was not fulfilled, or there was no conditional waiver at all. As the circuit court ruled, "under either scenario, the 12–month period had been exceeded and there was a conditional waiver in the agreement which could not be satisfied." Consequently, the City must pay the Trustees' out-of-pocket expenses pursuant to ROH § 38–5.2.

Accordingly, we hold that the circuit court did not err in granting the Trustees' motion for partial summary judgment with respect to Count VIII of their complaint. We therefore affirm the circuit court's judgment in favor of the Trustees as to Counts VI, VII, and VIII of the Trustees' complaint.

## IV. *CONCLUSION*

Based on the foregoing discussion, we partially affirm and partially vacate the circuit court's final judgment, entered on February 9, 2000, and we remand the matter to the circuit court for further proceedings consistent with this opinion.