83 P.3d 100

Jade WEMPLE, a minor, by her Next Friend, Charles H.Y. DANG, Petitioner–Plaintiff–Appellant/Cross–Appellee,

and

Dawn Wemple, Plaintiff–Appellee/Cross–Appellee,

v.

Dean A. DAHMAN; Association of Apartment Owners of Summer Villa; and Fidelity Management, Inc., Respondents–Defendants–Appellees/Cross–Appellees,

and

Richard T. Yoshida and May H. Yoshida, Respondents–Defendants–Appellees/Cross–Appellants,

and

John Does 2–10; Doe Corporations 2–10; Doe Partnerships 1–10; Doe Governmental Entities 1–10; and Doe Unincorporated Associations 1–10, Defendants,

and

Association of Apartment Owners of Summer Villa; and Fidelity Management, Inc., Respondent s-Third-Party-Plaintiffs-Appellees/Cross-Appellees,

v.

Kim Mau; Gordon F. Liu and Annette K. Liu, individually and as Trustees of the Gordon F. Liu and Annette K. Liu Trust dated June 10, 1992, Hideo Yokota, and Kiyoko Yokota, Respondents–Third–Party–Defendants–Appellees/Cross–Appellees.

No. 21497.

Supreme Court of Hawai'i.

Jan. 30, 2004.

386

James J. Bickerton and William W. Saunders, Jr., Honolulu, On the briefs, for petitioner-plaintiff-appellant/cross-appellee Jade Wemple.

John T. Komeiji, Patsy H. Kirio, and Brian A. Kang, Honolulu, On the briefs, for respondents-defendants-appellees/cross-appellees Association of Apartment Owners of Summer Villa and Fidelity Management, Inc.

Lisa A. Ginoza and Christopher J. Cole, Honolulu, On the briefs, for respondents-defendants-appellees/cross-appellants Richard T. Yoshida and May H. Yoshida.

Dean E. Ochiai, Brenda Morris Hoernig, Shannon L. Wack, and Randall Y. Kaya, Honolulu, On the briefs, for respondents-third-party defendants-appellees/cross-appellees Kim Mau, Gordon F. Liu, and Annette K. Liu, Individually and as Trustees of The Gordon F. Liu and Annette K. Liu Trust Dated June 10, 1992.

Ralph R. LaFountaine, Michael N. Tanoue, Honolulu, and Kara Moran, On the briefs, for respondents-third-party defendants-appellees/cross-appellees Hideo Yokota and Kiyoko Yokota.

Seth R. Harris, Deputy Corporation Counsel, On the briefs, for amicus curiae City and County of Honolulu.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by DUFFY, J.

Plaintiff-Appellant/Cross-Appellee Jade Wemple applied for a writ of certiorari to review the published opinion of the Intermediate Court of Appeals (ICA) in *Wemple ex rel. Dang v. Dahman,* 102 Hawai'i 27, 72 P.3d 499 (App.2002) [hereinafter, the ICA's opinion or *Wemple I* ]. The ICA's opinion, 102 Hawai'i 27, 72 P.3d 499 (2002) affirmed the judgment of the first circuit court[1] granting the defendants' motion for summary judgment.[2]

Based on the following, we hold that the circuit court and the ICA erred in granting and upholding defendants' motion for summary judgment because there are genuine issues of material fact which should have been left to the jury.

## I. BACKGROUND

### A. Case Overview

This is a negligence case arising from a pedestrian-vehicle collision on October 23, 1991. Jade Wemple, then seven years old, ran out from behind a parked car onto a privately owned road adjacent to the Summer Villa Condominium [hereinafter, "SV"] and was struck by a pick-up truck driven by Dean Dahman. Wemple was seriously injured, and filed a lawsuit (by her next friend, Charles H.Y. Dang) together with her mother, Dawn Wemple [hereinafter collectively, the Plaintiffs], against: (1) Dahman, the driver; (2) AOAO; (3) Fidelity Management, Inc.

---

1. The Honorable Dan T. Kochi, presiding.

2. Defendants Association of Apartment Owners of Summer Villa [hereinafter, AOAO] and Fidelity Management, Inc., moved for summary judgment; their motion was joined by third-party defendants Hideo and Kiyoko Yokota; defendants and third-party defendants Kim Mau, Gordon Liu, and Annette Liu; and partially by defendants Richard Yoshida and May Yoshida (joining the motion inasmuch as the Yoshidas also wished to be dismissed from the case, but opposing the motion to the extent that the court would dismiss AOAO and Fidelity but not the Yoshidas). In August 1997, all parties filed a stipulation of dismissal against Dahman; this stipulation was in addition to the Plaintiffs' stipulation of dismissal against Dahman filed on October 31, 1996.

[hereinafter, Fidelity], AOAO's property manager at the time of the accident; and (4) Richard T. Yoshida and May H. Yoshida, (the Yoshidas), Hideo Yokota and Kiyoko Yokota (the Yokotas), Kim Mau, and Gordon F. Liu and Annette K. Liu (the Lius), owners of properties abutting or located in the vicinity of the privately owned road. Hereinafter, all defendants will be collectively referred to as "Defendants," and all defendant property owners—that is, all defendants except Dahman—will be referred to as "Defendant Property Owners."

The Plaintiffs alleged that the Defendant Property Owners were negligent in their maintenance of the private roadway. Specifically, the Plaintiffs alleged that the Defendant Property Owners: failed to sign or otherwise mark the accident site as a pedestrian right of way; failed to place speed bumps, warning signs, or rumble strips on the private roadway; failed to enforce parking restrictions along the private roadway; and failed to take other reasonable steps to control the speed of vehicles along the private roadway. The Plaintiffs also alleged that unidentified Doe Defendants were negligent in parking their cars in an area of the privately owned road marked "no parking."

The Defendant Property Owners argue that they should not be held liable because they owed no duty to the Plaintiffs. They argue that there is a public easement over the private roadway; therefore, they argue, they had no control over the private roadway and owed no duty to maintain or repair the roadway or warn travelers of potential dangers.

### B. *Factual Background*

The ICA related the relevant facts as follows:

#### A. *The Road*

The accident that prompted this lawsuit occurred on an unnamed, paved, privately owned road that intersects two perpendicular streets in the Kapahulu area of the [City and County of Honolulu (the County) ]: Olokele Avenue, which runs north to south; and Winam Avenue, which runs east to west. The privately owned road begins on Olokele Avenue, travels diagonally northeast, and ends at Winam Avenue.

The privately owned road has apparently existed since at least prior to 1948 and was originally part of a longer road (the original road) that provided access to a now-defunct artesian well lot. The existence of the privately owned road is shown on a subdivision map included in the record on appeal. Additionally, a May 17, 1948 construction plan for the proposed extension of Olokele Avenue indicates that the extension of Olokele Avenue destroyed part of the original road and separated the privately owned road from the rest of the original road.

On the eastern side of the privately owned road are the properties owned or managed, from south to north, by the Lius, SV Defendants, and the Yoshidas. The Yokotas' property, which does not abut the privately owned road, lies to the east of the property on which the SV sits (the SV site). Mau's property, which also does not abut the privately owned road, appears to have formerly abutted that part of the original road that was destroyed by the Olokele Avenue extension project in 1948. A County sewer easement runs between the SV site and the Yoshidas' property.

Between Olokele Avenue and the western side of the privately owned road is a triangular landscaped area owned by the County. This triangular area is bisected by two five-foot-wide walkways that connect Olokele Avenue to the privately owned road and provide pedestrian access to the properties along the privately owned road....

The privately owned road has always remained open to pedestrian and vehicular access by the general public, and no efforts have ever been made by Defendant Property Owners to limit use of the privately owned road to only those vehicles or pedestrians needing access to properties along the privately owned road. In 1983, because the triangular area had been neglected by the County and had become an eyesore and a hazard, with vehicles illegally parked and trash dumped there, AOAO

leased the area from the County and landscaped it. AOAO also obtained permission from the County to erect a waist-high hedge and fence around the triangular area to prevent vehicles from parking there.

As part of improvements made to the triangular area, AOAO had three "no parking" signs installed on the portion of the triangular area directly fronting the SV. These signs enabled AOAO to keep the portion of the privately owned road between the SV site and the triangular area fronting the SV clear and passable for fire, police, ambulance, and resident and non-resident traffic. The SV resident manager helped to enforce these "no parking" signs by asking drivers to park their vehicles elsewhere or having violating vehicles towed away. Prior to 1986, AOAO's lease of the triangular area from the County was apparently canceled due to a technicality. For a short period of time after the lease expired, however, AOAO's gardener continued to maintain the entire triangular area and, thereafter, maintained only the area fronting the SV. The remainder of the triangular area was apparently maintained on a voluntary basis by an SV resident.

In 1986, the County Transportation Department advised AOAO that the "no parking" signs would be removed, unless AOAO obtained authorization from the County's Chief Engineer for the signs to remain. Accordingly, on August 5, 1986, AOAO's then-property manager wrote to the County's Chief Engineer, seeking such authorization. By a letter dated September 8, 1986, the County's Chief Engineer responded, "[W]e have no objections to the retention of the three '[n]o [p]arking' signs on the [County's] parcel[.]"

On July 11, 1990, AOAO's then-property manager requested that the County resurface the part of the privately owned road that fronted the SV. The County Council [the Council of the City and County of Honolulu] had previously adopted a resolution authorizing the County to resurface privately owned roads that met certain criteria. [*See* discussion of County Council Resolution No. 81–252, *infra.*] ... The County responded to the request by resurfacing the entire road, not just the portion fronting the SV.

### B. *The Owners of the Privately Owned Road*

It is not known who all the current owners of the privately owned road are. Documents in the record indicate that there are "various owners" and that fee simple ownership of the land underlying the original road was initially divided among the [various] owners of real property.... The documents also indicate that the County has a fractional ownership interest and other easement interests in the privately owned road.

With respect to the Defendant Property Owners sued by [Wemple], it appears to be undisputed that: (1) AOAO currently owns a 3/44th fee simple interest in the privately owned road but held only a leasehold interest in the SV site at the time of the accident; (2) the Yoshidas own a 1/11th interest in the privately owned road but do not live in the apartment building that sits on their property that fronts the accident scene; (3) the Yokotas own a 1/11th interest in the privately owned road, but their property does not abut the privately owned road and is located behind the SV site, fronting Lukepane Avenue, the street that runs parallel to Olokele Avenue; (4) the Lius ... own a 1/11th interest in the privately owned road; and (5) there is no indication in the record that Mau, whose property runs along Olokele Avenue and does not abut the privately owned road (but did abut the original road), owns any fractional interest in the privately owned road.

### C. *The Accident*

Prior to the accident, [Wemple] was playing with her friend, Lina Tongotea (Lina), in the area of the mauka [3] walkway. It is unclear what circumstances led

---

**3.** "Mauka" means "inland." M.K. Pukui & S.H. Elbert, *Hawai'ian Dictionary* 242 (1986). The "mauka walkway" was located inland, closer to the mountain, than the other walkway connecting Olokele Avenue to the privately owned road.

to [Wemple] being on the privately owned road when she was struck by Dahman's pick-up truck. [Wemple]'s complaint alleged that the accident "occurred when a motor vehicle driven by [Dahman] collided into [Wemple,] who was crossing from a pedestrian right of way." During her deposition, [Wemple] indicated that she had been playing "chase master" with Lina just before the accident and was running "in between the cars" parked on the side of the privately owned road so Lina could not catch her. Dawn informed a police officer who was investigating the accident that she had been informed by Lina that "[a] few other kids in the parking lot were throwing rocks at [Wemple]" and "[Wemple] jumped to avoid from getting struck by the rocks and in doing so she was struck" by Dahman's pick-up truck.

In his deposition, Dahman testified that he was driving a truck owned by Tevita Tongotea, Lina's father, to the Tongotea residence at 2823 Winam Avenue, which is past the Yoshidas' apartment building. Prior to turning onto the privately owned road, Dahman explained, he was driving makai [4] on Olokele Avenue and noticed "four to five" children playing in the area of the mauka walkway. A dog also "ran out into Olokele Avenue in front of the truck before [Dahman] got to the walkway." Dahman described the accident as follows:

> I turned off Winam Avenue to the left, and I came down Olokele [Avenue]. I saw the children. Made the almost U-turn onto the private[ly owned road]. I was coming up here. I was going maybe 5 to 10 miles an hour. I came up along side where these vans and cars were parked. It's fairly narrow. The children are out of my view. I was going slow, because I knew they were there, and it is a private[ly owned road].
>
> And [Wemple] darted out from behind the van, turned, and ran straight towards the front of the truck. She was looking over her shoulder back where she was coming from. She never saw

the truck. And we impacted, and the rest is basically what is in the police report.

> I jumped out of the truck. She was kind of hooked to the truck for a minute, and then she fell off.

. . . .

The police officers who arrived at the scene shortly after [Wemple] was struck were unable to locate any direct witnesses to the accident. They determined, however, that the skid marks left by the tires of Dahman's pick-up truck were between four to five feet long.

. . . .

T.R. Bongartz, an accident reconstruction expert retained by [Wemple] to analyze the accident, stated in an affidavit as follows:

> 5. It is my professional opinion that if [Dahman] was travelling [sic] at ten (10) miles per hour just before the accident, he would have been covering at fifteen (15) feet per second and, considering a normal perception and reaction time of 1.5 seconds, his total stopping distance after seeing [Wemple] would have been approximately 27.5 feet.
>
> 6. It is my experience that speedbumps have a tendency to slow vehicles down to five (5) miles per hour or below as the vehicles traverse the speed bump.
>
> 7. It is my professional opinion that if [Dahman] had been travelling [sic] at five (5) miles per hour (speed bump), he would have been covering at seven and one-half (7–1/2) feet per second and, considering a normal perception and reaction time of 1.5 seconds, his total stopping distance after first seeing [Wemple] would have been approximately 12 feet, and the accident would not have occurred the way it did.
>
> 8. It is also my professional opinion that the large van which was described by [Dahman] and [another individual] obstructed [Dahman's] view of the walkway and of the children playing thereon.

---

4. "Makai" means "ocean." M.K. Pukui & S.H. Elbert, *Hawai'ian Dictionary* 225 (1986). By "driving makai," Dahman was driving in the direction of the ocean.

9. It is my further professional opinion that if the large van had not obstructed [Dahman's] view of the walkway, he would have seen [Wemple] earlier and he would have been able to apply his brakes earlier, thereby preventing the accident as it occurred.

*Wemple I*, 102 Hawai'i at 30–35, 72 P.3d at 502–07 (footnotes omitted) (some alterations in original and some added).

## C. *Procedural History*

On April 30, 1993, defendants AOAO and Fidelity filed a motion for summary judgment. Judge Wendell Huddy heard oral arguments on June 25, 1993 and denied the motion, issuing a written order of denial on July 12, 1993.

On March 29, 1994, the Yoshidas filed a motion for summary judgment. Judge Melvin Soong heard oral arguments on July 15, 1994 and issued a written order of denial on September 22, 1994.

Defendants AOAO and Fidelity filed a second motion for summary judgment on October 24, 1994. Judge Dan T. Kochi heard oral arguments on December 9, 1994 and took the matter under advisement. The court issued a written order granting the motion on February 7, 1995.

Wemple filed a motion for reconsideration on February 17, 1995. Judge Kochi heard oral arguments on March 1, 1995 and denied the motion for reconsideration, issuing a written order of denial on April 24, 1995.

On May 4, 1995, Wemple moved for an entry of final judgment and for stay of proceedings pending appeal pursuant to Rule 54(b) of the Hawai'i Rules of Civil Procedure. The circuit court scheduled a Status/Scheduling Conference for May 29, 1996; Wemple, in her Status/Scheduling Conference statement, asked for additional time in which to finalize the stipulation of dismissal against Dahman. On April 22, 1997, all parties filed a stipulation of dismissal against Dahman, and the circuit court entered a final judgment on August 8, 1997.

On August 14, 1997, Wemple filed a notice of appeal of the circuit court's final judgment of August 8, 1997. On October 24, 1997, this court issued an order of dismissal because the August 8, 1997 judgment "[did] not, on its face, resolve the cross-claims, counterclaims and third-party claims of all the parties" (citing *Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 119–20, 869 P.2d 1334, 1338–39 (1994)). The first circuit court issued its First Amended Final Judgment on April 13, 1998, "resolv[ing] all claims, counterclaims, and crossclaims raised by all parties in this case."

On April 16, 1998, Wemple filed a notice of appeal with this court. On April 28, 1998, the Yoshidas filed a cross-appeal from the denial of their March 29, 1994 motion for summary judgment.

On October 27, 1998, this court assigned this case to the ICA. The ICA heard oral arguments on July 30, 2001; on June 3, 2002, the ICA issued a written opinion affirming the circuit court's grant of summary judgment.[5] Specifically, the ICA held that: (1) the "law of the case" doctrine did not bar the circuit court from granting the Defendant Property Owners' second motion for summary judgment even though the court had denied the first motion; (2) the circuit court erred by issuing findings of fact in connection with its grant of summary judgment; (3) the privately owned road is a public easement such that the Defendant Property Owners had no duty to maintain or repair the road or to warn travelers on the road of hazards; (4) control of property, not ownership of property, determines liability; (5) although the issue of control is normally a question of fact left to the jury, Defendant Property Owners did not control the privately owned road and therefore were not liable for failure to maintain, failure to repair, or failure to warn; and (6) the circuit court correctly denied the Yoshidas' motion for summary judgment because the Hawai'i Recreational Use Statute (HRUS), Hawai'i Revised Statutes (HRS) Chapter 520 (1993 & Supp.2003), does not immunize the Yoshidas from the Plaintiffs' suit. *Wemple I*, 102 Hawai'i at 30, 45–47, 54–55, 72 P.3d at 502, 517–19, 526–27.

---

5. As amended June 10, 2002.

Wemple filed an application for a writ of certiorari on July 3, 2002, which we granted. In her application, Wemple argues that the ICA gravely erred by: (1) holding that a private landowner may absolve itself of liability for torts occurring on a private road if that road is impliedly dedicated to the public; and (2) holding that the Defendant Property Owners did not have control over the private roadway.[6]

## II. STANDARDS OF REVIEW

### A. Writ of Certiorari

In granting a writ of certiorari, this court reviews decisions for (1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the ICA with that of the supreme court, federal decisions, or its own decision and the magnitude of such errors or inconsistencies dictating the need for further appeal. See HRS § 602–59 (1993).

### B. Summary Judgment

We review the circuit court's grant or denial of summary judgment de novo. Hawaii [sic] Community Federal Credit Union v. Keka, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

Id. (citations and internal quotation marks omitted).

Coon v. City and County of Honolulu, 98 Hawai'i 233, 244–45, 47 P.3d 348, 359–60 (2002) (alteration in original).

### C. Statutory Interpretation

"The interpretation of a statute is a question of law reviewable de novo." State v. Camara, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996).

## III. DISCUSSION

### A. The Private Roadway is Not a County Highway.

The ICA thoroughly analyzed the complex history of the public road system in Hawai'i. Wemple I, 102 Hawai'i at 47–51, 72 P.3d at 519–523. The ICA correctly concluded, in Wemple I and Maui Ranch Estates Owners Ass'n v. County of Maui, 6 Haw. App. 414, 724 P.2d 118 (1986), that HRS § 264–1 (Supp.1990)[7] prevents a private road

---

6. The Yoshidas contest the ICA's holding on the issue of whether the circuit court erred in denying the Yoshidas' motion for summary judgment. The Yoshidas argue that the HRUS applies to immunize them from Wemple's suit, such that the circuit court erred in denying the Yoshidas' motion for summary judgment on this issue. However, we do not reach this issue because, even though contested by the Yoshidas, the issue is not properly before the court. The issue is not raised by Wemple in her application for certiorari. Instead, the Yoshidas raise this issue at the end of their Response to Wemple's Application for Certiorari, in a brief paragraph that does not conform with the requirements of Hawai'i Rules of Appellate Procedure (HRAP) Rule 40.1 for an application for a writ of certiorari. Therefore, we consider only those points of error raised by Wemple in her application for a writ of certiorari.

7. HRS § 264–1 provides:

**Public highways and trails.** (a) All roads, alleys, streets, ways, lanes, bikeways, and bridges in the State, opened, laid out, or built by the government are declared to be public highways. Public highways are of two types:
(1) State highways, which are all those under the jurisdiction of the department of transportation; and
(2) County highways, which are all other public highways.
(b) All trails, and other nonvehicular rights-of-way in the State declared to be public rights-of-ways by the highways act of 1892, or opened, laid out, or built by the government or otherwise created or vested as nonvehicular public rights-of-way at any time thereafter, or in the future, are declared to be public trails. A public trail is under the jurisdiction of the

from becoming a "county highway"—and thereby subjecting the county to liability for injuries incurred thereon—without express acceptance of the private road by the County Council.[8] *Wemple I,* 102 Hawai'i at 50–53, 72 P.3d at 522–25; *Maui Ranch,* 6 Haw.App. at 420–22, 724 P.2d at 123–24. " '[B]efore the municipality can be held responsible for maintenance, repair, and liability there must be unequivocal acceptance by the municipality.' " *Wemple I,* 102 Hawai'i at 51, 72 P.3d at 523 (quoting *Maui Ranch,* 6 Haw.App. at 421, 724 P.2d at 123 (block quote formatting omitted)). In the instant case, the County has not expressly accepted the private roadway as required by HRS § 264–1; therefore, the private roadway is not a county highway.

B. *Degree of Control Determines Liability.*

 The ICA was also correct in concluding that the test for determining liability is degree of control rather than mere ownership. *Wemple I,* 102 Hawai'i at 54, 72 P.3d at 526 (citing *Levy v. Kimball,* 50 Haw. 497, 499, 443 P.2d 142, 144 (1968) ("[T]he rule is that 'it is the control and not the ownership which determines the liability.' " (Quoting *Re Taxes Victoria Ward,* 33 Haw. 235, 237 (1934)))). *See, e.g., Kurtigian v. City of*

*Worcester,* 348 Mass. 284, 203 N.E.2d 692, 693 (Mass.1965) ("Liability for damage caused by the defective condition of premises turns upon whether a defendant was in control, either through ownership or otherwise."); *Wireman v. Keneco Distribs., Inc.,* 75 Ohio St.3d 103, 661 N.E.2d 744, 748 (1996) ("It is a fundamental tenet of premises tort law that to have a duty to keep premises safe for others one must be in possession and control of the premises."). *See also* Restatement (Second) of Torts §§ 333–350 (1965) (imposing liability on "possessors" of land for injuries to trespassers, licensees, and invitees); *id.* at § 328E ("A possessor of land is (a) a person who is in occupation of the land with intent to control it or (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b)."). Where a private landowner is not in control of the activities occurring on her land, that landowner will not be liable for injuries occurring thereon. *Merritt v. Nickelson,* 407 Mich. 544, 287 N.W.2d 178 (1980) (holding that where one cotenant of property operated

state board of land and natural resources unless it was created by or dedicated to a particular county, in which case it shall be under the jurisdiction of that county.

(c) *All roads, alleys, streets, ways, lanes, trails, bikeways, and bridges in the State, opened, laid out, or built by private parties and dedicated or surrendered to the public use, are declared to be public highways or public trails as follows:*

(1) Dedication of public highways or trails shall be by deed of conveyance naming the State as grantee in the case of a state highway or trail and naming the county as grantee in the case of a county highway or trail. The deed of conveyance shall be delivered to *and accepted by* the director of transportation in the case of a state highway or the board of land and natural resources in the case of a state trail. In the case of a county highway or county trail, the deed shall be delivered to and accepted by the legislative body of a county.

(2) Surrender of public highways or trails shall be deemed to have taken place if no act of ownership by the owner of the road, alley, street, bikeway, way, lane, trail, or bridge has been exercised for five years and when, in the case of a county highway, in addition

thereto, the legislative body of the county has, thereafter, by a resolution, adopted the same as a county highway or trail.

*In every case where the road, alley, street, bikeway, way, lane, trail, bridge, or highway is constructed and completed as required by any ordinance of the county or any rule, regulation, or resolution thereof having the effect of law, the legislative body of the county shall accept the dedication or surrender of the same without exercise of discretion.*

(d) All county public highways and trails once established shall continue until vacated, closed, abandoned, or discontinued by a resolution of the legislative body of the county wherein the county highway or trail lies. All state trails once established shall continue until lawfully disposed of pursuant to the requirements of chapter 171.

(Emphases added.)

**8.** This general holding does not apply to private roadways that counties are required to accept pursuant to HRS § 264–1(c) or to those roadways abandoned to the public for five years at the time of passage of The Highways Act of 1892, 1892 Haw. Sess. L. Ch. XLVII at pp. 68–75. *Wemple I,* 102 Hawai'i at 48, 53 n. 12, 72 P.3d at 520, 525 n. 12.

a racetrack on a portion of that property, and the other cotenant did not participate in operating the racetrack, the non-participating cotenant was not liable for injuries sustained on the racetrack because the participating cotenant became the sole "possessor" of the land within the meaning of Restatement (Second) of Torts § 328E).

## C. Degree of Control is a Question of Fact.

The ICA correctly noted that "[t]he issue of control or amount of control, unlike the issue of duty, is ordinarily a question of fact that should be left to the jury." *Wemple I,* 102 Hawai'i at 55, 72 P.3d at 527 (citing *Sanchez v. City of Tucson,* 191 Ariz. 128, 953 P.2d 168, 170–71 (1998)).

## D. The ICA Erred in Concluding, Without Remanding for Trial, that the Defendant Property Owners did not Control the Private Roadway.

Despite its acknowledgment that the amount of control is ordinarily a question of fact for jury determination, the ICA itself determined that the Defendant Property Owners had no control over the private roadway and therefore had no duty to maintain, repair, or warn of a dangerous condition. The ICA based its determination on three factors: (1) that the privately owned road was platted on a subdivision map; (2) that

HRS § 265A–1 (Supp.1990) [9] authorized counties to repair and maintain private streets; and (3) that HRS § 46–16 (Supp. 1990 & Supp.2002) [10] authorized counties to regulate traffic on private streets (and the County Council passed a Traffic Code asserting authority pursuant to this statute). Although each of these factors is significant in determining which party or parties had control of the roadway, the ICA gravely erred in concluding that these three factors were dispositive.

### 1. Platting of a privately owned road does not divest the owners of control over the road.

The private roadway in question had been platted on a subdivision map, and the County accepted the filing of this map. *Wemple I,* 102 Hawai'i at 53, 72 P.3d at 525. The ICA concluded that this platting constituted an immediate public dedication of the private roadway; the ICA based its ruling on this court's decision in *Territory v. Ala Moana Gardens, Ltd.,* 39 Haw. 514, 520–51 (1952), in which this court cited with approval *Morrow v. Richardson,* 278 Ky. 233, 128 S.W.2d 560, 562 (1939) (holding that an owner's recording of a plat "amounted to an immediate dedication of such streets to the use of the purchasers of the lots and of the public, although the streets were not actually opened and there had been no acceptance by the city"), and

---

9. HRS § 265A–1, entitled "County authority," provides in relevant part:

> The several councils or other governing bodies of the several political subdivisions of the State shall have the general supervision, charge, and control of, and the duty to maintain and repair, all county highways.... *Any other law to the contrary notwithstanding, the several counties by ordinance may take over, or receive by dedication or otherwise, any private street or way or may improve, grade, repair, or do any construction work upon private streets, ways, pavement, water lines, street lighting systems, or sewer repairs.*

(Emphasis added.)

10. In 1991, HRS § 46–16 provided:

> **Traffic regulation and control over private streets.** Any provision of law to the contrary notwithstanding, any county and its authorized personnel may impose and enforce traffic regulations and place appropriate traffic control devices, and may enforce chapters 286 and 291C, on the following categories of private streets, highways, or thoroughfares, except private roads used primarily for agricultural and ranching purposes:
>
> (1) Any private street, highway, or thoroughfare which has been used continuously by the general public for a period of not less than six months; provided that the county shall not be responsible for the maintenance and repair of the private street, highway, or thoroughfare when it imposes or enforces traffic regulations and highway safety laws or places or permits to be placed appropriate traffic control devices on that street, highway, or thoroughfare; provided further that no adverse or prescriptive rights shall accrue to the general public when the county imposes or enforces traffic regulations and highway safety laws or places appropriate traffic control devices on that street, highway, or thoroughfare....

This section was amended in 1995, and the following was added to the end of paragraph (immediately preceding the ellipses): "nor shall county consent to the placement of traffic control signs or markings on a private street be deemed to constitute control over that street[.]"

*Clark v. Ferguson,* 346 Mo. 933, 144 S.W.2d 116, 118 (1940) (holding that an owner's recording of a plat divested the owner of title to the streets "which were dedicated to public use"). *Wemple I,* 102 Hawai'i at 52, 72 P.3d at 524.

■ However, platting does not necessarily divest a private landowner of control over the dedicated roadways. In *City and County of Honolulu v. Boulevard Properties, Inc.,* 55 Haw. 305, 313, 517 P.2d 779, 784 (1973), we noted that, "in our opinion, the holding in *Ala Moana Gardens* contemplates an eventual statutory dedication of the street areas shown on the subdivision map when the streets are opened." This comports with the general rule that, while an owner of property may be precluded from revoking a dedication from those who purchased lots in reliance on that dedication, the owner may be able to revoke that dedication with respect to the general public. *See, e.g., Petition of Engelhardt,* 368 Mich. 399, 118 N.W.2d 242, 243 (1962); *Owens v. Elliott,* 257 N.C. 250, 125 S.E.2d 589, 592 (1962). *But see City of Sher-*

*wood v. Cook,* 315 Ark. 115, 865 S.W.2d 293, 299 (1993) (discussing prior case law in which an owner's selling of lots in reference to a plat constituted an irrevocable public dedication). Without express County acceptance of the private roadway, the Defendant Property Owners have not forfeited title; consequently, they have not necessarily forfeited the power to control the roadway (by installing signs, speed bumps, or other speed-reducing devices). Therefore, the mere fact that the road was recorded on a plat does not, in itself, establish the Defendant Property Owners' lack of control so as to warrant the grant of summary judgment.

## 2. County maintenance of a privately owned road does not divest the owners of control over the road.

■ The ICA concluded that HRS § 265A–1 (Supp.1990), combined with County Council Resolution No. 81–252 (1981),[11] provided further evidence that the privately owned roadway in question was undoubtedly not under private control. We disagree.

---

11. County Council Resolution No. 81–252 provides in relevant part:

ESTABLISHING A NEW POLICY FOR THE MAINTENANCE OF STREETS AND ROADS IN THE CITY AND COUNTY OF HONOLULU.

WHEREAS, the "first-aid" policy for maintenance of non-dedicated or non-surrendered roads was adopted by the Council in 1967; and

WHEREAS, the [County] desires to up-date its policy for the maintenance of all streets and roads; and

WHEREAS, it is in the public interest that the [County] maintain those streets and roads which serve the general public and are necessary for transportation purposes, whether publicly-owned or non-dedicated or non-surrendered; and

WHEREAS, the Department of Transportation Services has compiled a list of such streets and roads; and

WHEREAS, it is also in the public interest that the [County] provide remedial maintenance and/or resurfacing to other non-dedicated or non-surrendered streets open to the public; now, therefore,

BE IT RESOLVED by the Council of the City and County of Honolulu that Committee Report No. 1494, adopted August 8, 1967, be and hereby is repealed, and that the following be, and hereby is, adopted as the new policy of the [County] for the maintenance of streets and roads in the City and County of Honolulu:

STREET MAINTENANCE POLICY

The City and County shall maintain the streets and roads in the City and County of Honolulu in the following manner:

1. Maintain by either remedial patching, resurfacing, or reconstruction, a) all [County]-streets, and b) those non-dedicated or non-surrendered streets shown in Exhibit A, with the exception of those streets maintained by other agencies or entities. (Exhibit A identifies those streets that serve the general public and are necessary for transportation purposes, including both publicly-owned and non-dedicated or non-surrendered streets.)

2. Maintain by either remedial patching or resurfacing, other non-dedicated or non-surrendered PAVED roads serving six (6) or more individually-owned parcels upon the request of abutting owners. If in the judgment of the Director and Chief Engineer, a pavement is in such poor condition that remedial patching is impractical and not cost effective, resurfacing may be provided. Remedial patching and resurfacing shall be as follows:

a) Asphalt concrete for asphalt concrete paved roads

b) Portland cement concrete *or* asphalt concrete for portland cement concrete paved roads.

3. Maintain other non-dedicated or non-surrendered UNPAVED roads serving six (6) or more individually-owned parcels with like materials, i.e., coral for coral, crushed rock for crushed rock, upon the request of abut-

Section 265A–1 provides that "[a]ny other law to the contrary notwithstanding, the several counties by ordinance *may* take over, or receive by dedication or otherwise, any private street or way or *may* improve, grade, repair, or do any construction work upon private streets, ways, pavement, water lines, street lighting systems, or sewer repairs." (Emphases added.) Section 265A–1 therefore does not require the counties to take over private roadways, thus demonstrating a lack of County control · in the instant case.

▬▬▬ Pursuant to the then-existing version of HRS § 265A–1, the County Council adopted Resolution No. 81–252.[12] The County Council did not undertake to maintain all private roads in the county; instead, the County Council provided that "[t]he [County] *shall* maintain the streets and roads in the [County] in the following manner: ... Maintain by either remedial patching or resurfacing, other non-dedicated or non-surrendered [paved] roads serving six (6) or more individually-owned parcels *upon the request of abutting owners.*" (Emphases added.)

Contrary to the ICA's conclusion, this provision indicates an intent to keep control of private roadways in the hands of the private owners: the County does not decide when and whether to maintain private roadways, but does so only at the request of the property owners. If the Resolution did not exist, the private owners would still need to decide if and when they wished to repair the roadway; they would then either complete the work themselves or hire a contractor to complete the work for them. With the Resolution in place, the private owners have the additional option of contacting the County and requesting that the County complete the work for them. Therefore, the Defendant Property Owners have the same level of control as they would if this Resolution did not exist—they simply have the extra option of having the County complete the work for them.[13]

### 3. The Traffic Code did not divest the owners of control over the road.

The third factor the ICA held to be dispositive was HRS § 46–16 combined with the

---

ting owners but subject to availability of equipment and manpower in the area.

4. No maintenance work shall be performed by the [County] on non-dedicated or non-surrendered roads which are so marked or delineated as to exclude the general public.

5. No maintenance work shall be performed by the [County] on non-dedicated or non-surrendered roads which are part of a cluster development, planned development, or similar type of development.

6. No maintenance work shall be performed by the [County] on streets that the developer or subdivider has declared his intention not to dedicate to the [County] as provided in the subdivision rules and regulations....

12. In 1981, HRS § 265A–1 was substantially similar to the current version of this statute except that the then-existing version did not contain the following provision: "Any other law to the contrary notwithstanding, the several counties by ordinance may take over, or receive by dedication or otherwise, any private street or way or may improve, grade, repair, or do any construction work upon private streets, ways, [or] pavement[.]" *See* HRS § 265A–1 (Supp. 1981).

13. We also note that County Council Resolution No. 81–252 is a resolution, not an ordinance, and therefore does not have the binding effect of an ordinance: "In exercising its non-legislative power, the [County] Council may do so by reso-

lution or by resorting to some other parliamentary procedure, such as by voting on a motion made at council meeting.... 'Any action of the body which does not rise to the dignity of an ordinance, is a resolution[.]'" *Life of the Land, Inc. v. City Council of the City and County of Honolulu,* 61 Haw. 390, 423, 606 P.2d 866, 887 (1980) (quoting *Town of Irvington v. Ollemar,* 128 N.J. Eq. 402, 16 A.2d 563, 566 (1940)). In 1996, however, the County Council passed an ordinance entitled "Maintenance of Private Streets and Roads," I Revised Ordinances of Honolulu (ROH) § 14–32 (1996), in which the County Council stated that "[s]ubject to the availability of appropriations, the department of public works *may* maintain by either remedial patching, resurfacing, or paving those portions of private, nondedicated and nonsurrendered streets and roads" meeting certain criteria. I ROH § 14–32.2(a) (emphasis added). The ordinance defined "[p]rivate, nondedicated and nonsurrendered streets and roads" as "streets, roads, highways, ways or lanes used for purposes of vehicular traffic which are owned, in whole or in part, by persons other than governmental entities and which· have not been dedicated or surrendered to the· city in accordance with HRS Section 264–1(c)(1) and (2)."

Therefore, the County has never.obligated itself to conduct maintenance on the private roadway in question, thus undercutting the ICA's determination that the County controlled the private roadway.

County Council's adoption of a Traffic Code, I ROH § 15–1.1 (1990) [hereinafter, the Traffic Code].[14] The ICA interpreted the Traffic Code to be the County Council's acknowledgment of control over the privately owned road. *Wemple I*, 102 Hawai'i at 56–58, 72 P.3d at 528–30. However, these enactments do not, in themselves, establish that the Defendant Property Owners maintained no control over the private roadway in question. The Traffic Code provides that the City and County of Honolulu can regulate traffic on all private streets open to the general public for six months or more. Under the ICA's analysis, virtually all private roadways would be considered under the County's control because the County has the right to regulate traffic thereon. Together with HRS § 264–1, the ICA's conclusion negates any need for a factual determination regarding degree of control, inasmuch as no private owner could ever be liable for dangerous conditions on private roadways that are open to the public for six months or more. There is nothing in the Traffic Code to suggest that the County Council intended to absolve owners of private roadways from any and all potential liability. *See State v. Yamada*, 99 Hawai'i 542, 553, 57 P.3d 467, 478, *recons. denied*, 100 Hawai'i 295, 59 P.3d 930 (2002) ("[I]t is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole duty is to give effect to the statute's plain and obvious meaning." (Citations and internal quotation signals omitted.)). Owners of private roadways can still assert control over those roadways, even in the face of the Traffic Code, because the Traffic Code does not clearly divest private owners of the right to regulate traffic on private roadways. The owners can determine whether and how to maintain and repair the roadway as discussed *supra;* for example, the owners can determine whether to designate certain areas as parking areas or no parking areas, whether to enforce those parking regulations, and whether to install speed-reducing measures such as speed bumps or signs.

Based upon the foregoing, the ICA gravely erred in concluding as a matter of law that the Defendant Property Owners did not control the private roadway. The issue of control of this roadway is a question of fact for jury determination.

E. *The ICA also Erred in Concluding, as a Matter of Law, that the Public Had an Easement Over the Private Roadway.*

 In addition to discussing the above-described three factors concerning control of the roadway, the ICA also concluded as a matter of law that the public had an easement over the privately owned road because that road had been impliedly dedicated to the public. *Wemple I*, 102 Hawai'i at 53–54, 72 P.3d at 525–26. Whether an easement exists is significant because, as this court has held, "an owner of an easement has the right and the duty to keep it in repair. The owner of the easement is liable in damages for injuries caused by failure to keep the easement in repair." *Levy v. Kimball*, 50 Haw. 497, 498, 443 P.2d 142, 144 (1968) (citations omitted). The ICA also gravely erred in reaching this conclusion. Whether an implied easement exists depends on the parties' intent and is therefore a question of fact. *Association of Apartment Owners of Wailea Elua v. Wailea Resort Co., Ltd.*, 100 Hawai'i 97, 106, 58 P.3d 608, 617 (2002).

 Furthermore, even if the public has an easement over the private roadway, the ICA erred in concluding as a matter of law that the Defendant Property Owners had no control over the private roadway: both the owner of an easement and the owner of the servient estate may be liable for dangerous conditions upon the land. *See, e.g., Sut-*

---

14. I ROH § 15–1.1 provides:
 **Purpose of ordinance.**
 The provisions hereinafter set forth are to provide for the regulation of traffic upon the public streets of the City and County of Honolulu; and such private streets, highways or thoroughfares which for six months or more have been continuously used by the general public or which are intended for dedication to the public use as provided in HRS Section 264–1 and are open for public travel but have not yet been accepted by the city, except private roads used primarily for agricultural purposes; and for bicycle paths constructed on easements granted to the City and County of Honolulu, and this chapter may be cited as the traffic code (1990) of the City and County of Honolulu.

*era v. Go Jokir, Inc.,* 86 F.3d 298, 302 (2nd Cir.1996). ("[I]n deciding whether the owner of an easement owes a duty of care towards third persons, the pivotal question is whether the easement holder may fairly be said to occupy, own, or control the relevant property. . . ."); *Sutton v. Monongahela Power Co.,* 151 W.Va. 961, 158 S.E.2d 98, 107 (1967) ("In cases involving a landowner and an easement over the land both the landowner and holder of the easement have mutual rights and duties.").

### IV. CONCLUSION

Based on the foregoing, we hold that there are genuine issues of material fact that make the granting of summary judgment inappropriate. We thus reverse the decision of the ICA, vacate the circuit court's February 7, 1995 grant of summary judgment, and remand to the circuit court for further proceedings.